632 F.2d 945
 Amy ROWLEY, by her parents and natural guardians, Clifford
and Nancy Rowley, and Clifford and Nancy Rowley,
in their own right, Plaintiffs-Appellees,
v.
The BOARD OF EDUCATION OF the HENDRICK HUDSON CENTRAL SCHOOL
DISTRICT, Westchester County, and the Commissioner
of Education of the State of New York,
Defendants-Appellants.
 No. 1105, Docket 80-7098.
 United States Court of Appeals,
Second Circuit.
 Argued May 1, 1980.
Decided July 17, 1980.
 
 Raymond G. Kuntz, Poughkeepsie, N.Y. (Teresa K. Kuntz and Kuntz & Spletzer, Poughkeepsie, N.Y., on the brief), for defendant-appellant Board of Education.
 Paul E. Sherman, Jr., Albany, N.Y. (Jean M. Coon, Albany, N.Y., on the brief), for defendant-appellant Commissioner of Education.
 Michael A. Chatoff, Jamaica, N.Y., for plaintiffs-appellees.
 Diane Shisk, Seymour Dubow and Marc Charmatz, Washington, D.C.; Thomas K. Gilhool, Frank J. Laski and Beverly Lucas, Philadelphia, Pa., filed a brief amici curiae for The National Association of the Deaf, Gallaudet College, and The American Coalition of Citizens with Disabilities.
 Norman H. Gross and McGivern, Shaw & O'Connor, Albany, N.Y., filed a brief amicus curiae for The New York State School Boards Association.
 Before MANSFIELD and TIMBERS, Circuit Judges, and BONSAL, Senior District Judge.*
 PER CURIAM:
 
 
 1
 This case is about Amy. She is eight years old. She is deaf and has been since birth. She needs a sign language interpreter in her classroom to enable her to have the same educational opportunity as her classmates. The district court, Vincent L. Broderick, District Judge, held that she is entitled by law to have such an interpreter. We agree and accordingly we affirm the judgment of the district court.
 
 
 2
 Amy Rowley presently is enrolled at the Furnace Woods School in the Hendrick Hudson Central School District, Peekskill, New York. In accordance with the requirements of federal law, The Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1401 et seq. (1978) (the Act), the School District prepared an individualized education program for Amy.[1]
 
 
 3
 Her parents objected to the program because no provision was made for a sign language interpreter. Accordingly, they commenced proceedings under New York law for the administrative review provided by the Act.[2] When the School District's decision not to provide an interpreter was upheld by the Commissioner of Education of the State of New York, the Rowleys, individually and on behalf of Amy, commenced the instant action in the Southern District of New York under Section 1415(e)(2).[3] The School District was named as defendant and the Commissioner subsequently was added as a necessary party defendant.
 
 
 4
 After a four day evidentiary hearing and after reviewing the records of the administrative proceedings, the district court made detailed findings of fact and concluded that Amy had been denied a "free appropriate public education" provided by the Act.[4] The court ordered the School District and the Commissioner to provide an interpreter during Amy's academic classes. 483 F.Supp. 528. The court also denied the Commissioner's motion to dismiss for lack of jurisdiction. 483 F.Supp. 536. From the judgment entered on the decisions of the district court, the School District and the Commissioner have appealed.
 
 
 5
 Our careful review of the record satisfies us that the district court's findings of fact are not clearly erroneous, but are adequately supported by the evidence. We also agree with the district court's conclusions of law. Accordingly, we affirm substantially for the reasons set forth in Judge Broderick's well-reasoned opinions of January 15, 1980, adding only the following brief observations of our own chiefly to focus upon certain critical evidence.
 
 
 6
 Amy is the child of deaf parents. Since her birth, her parents have communicated with her by a method which includes the use of sign language, visual cues, the mouthing of words, and amplification.
 
 
 7
 Amy is a bright child. Despite her handicap, she performs above the median standard of her class. The district court attributed this to her intense desire to learn and the extraordinary degree of additional academic help and support she receives from her parents.
 
 
 8
 Like many deaf people, Amy has some residual hearing. In her classroom she uses an FM wireless hearing aid. She also reads lips. This is a limited skill, however, under the best of conditions. Many sounds are not visible on the lips and communication is impossible when the teacher and students are not facing Amy.
 
 
 9
 The district court found, based on the evidence before it, including Amy's auditory speech discrimination tests, academic records, and observations of her in the classroom, that Amy misses a substantial part of what goes on in her classroom. The court found that, while only 59% of what transpires is now accessible to Amy under her present individualized education program, with a sign language interpreter 100% would be accessible to her.
 
 
 10
 The court therefore concluded that the services of an interpreter were needed "to bring her educational opportunity up to the level of the educational opportunity being offered to her non-handicapped peers." 483 F.Supp. at 535. The court held that Amy was entitled by law to have an interpreter during any school period when academic subjects are taught. We agree.
 
 
 11
 Section 1415(e)(2), supra note 3, provides that the district court's decision must be based "on the preponderance of the evidence".[5] The decision in the instant case clearly is supported by a preponderance of the evidence. Moreover, the court weighed and evaluated the evidence with great care. In affirming the judgment of the district court, we are satisfied that the court meticulously applied precisely the standard prescribed by Congress.[6]
 
 
 12
 Finally, we wish to emphasize the narrow scope of our holding. This is not a class action in which the needs of all deaf school children are being determined. The evidence upon which our decision rests is concerned with a particular child, her atypical family, her upbringing and training since birth, and her classroom experience. In short, our decision is limited to the unique facts of this case and is not intended as authority beyond this case.[7]
 
 
 13
 Affirmed.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 14
 I respectfully dissent on several grounds. First, the district court, unaware that the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401, et seq., already defines a "free appropriate public education," adopted an erroneous and impractical guideline or standard for determining whether a handicapped child's education is "appropriate" within the meaning of the pertinent sections of the Act, 20 U.S.C. §§ 1401(18), 1412(1), 1414(a)(1)(C) (ii), and regulations promulgated thereunder. Second, the court should first have given the state educational authorities, who have much more expertise in the education of handicapped children than the court, the opportunity to apply the proper standard and submit their determination before deciding the case. Third, in view of the paucity of evidence supporting the district court's findings, I believe the court erred in considering crucial hearsay affidavits that were not properly a part of the state administrative record or in evidence before it without giving the defendants an opportunity to cross-examine the affiants and offer rebuttal proof.
 
 
 15
 First a bit of undisputed background. The Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401, et seq. (the "Act"), obligates state and local educational agencies, as a condition to receiving federal grants under the Act, to develop and submit to the United States Commissioner of Education, a policy and procedure that will insure handicapped students a "free appropriate public education," 20 U.S.C. § 1412(1),[1] which is defined in 20 U.S.C. § 1401(18) as follows:
 
 
 16
 "(18) The term 'free appropriate public education' means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title."
 
 
 17
 See also 45 C.F.R. § 121a.4.
 
 
 18
 A "special education" is defined, 20 U.S.C. § 1401(16), as follows:
 
 
 19
 "(16) The term 'special education' means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." (Emphasis added).
 
 
 20
 See also 45 C.F.R. § 121a.14.
 
 
 21
 "Related services" are defined, 20 U.S.C. § 1401(17), as follows:
 
 
 22
 "(17) The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children."
 
 
 23
 See also 45 C.F.R. § 121a.13.
 
 
 24
 Regulations promulgated under the Act, although they define in detail the term "audiology" and refer to specific services and equipment to be furnished as "related services" to children with hearing problems, 45 C.F.R. § 11a.13(b), do not refer to a sign language interpreter.
 
 
 25
 The Act and regulations thereunder require the state to formulate and revise annually an individualized education program (IEP) for each handicapped child, 20 U.S.C. § 1414(a)(5), and the parents of the child are entitled to participate in the development of the IEP, 20 U.S.C. § 1401(19). The handicapped child must be placed in the least restrictive educational environment, i. e., educated in classrooms with non-handicapped children, 20 U.S.C. § 1412(5)(B). They may be removed to special classes, separate schooling, or other locations, only if the severity of the handicap prevents education in regular classes. 20 U.S.C. § 1412(5), 45 C.F.R. § 121a.550-556.
 
 
 26
 The State of New York has enacted legislation and promulgated regulations with respect to the education of handicapped children, which largely parallels the Act and federal regulations. N.Y. Education Law, §§ 4201-4210, 4351-57, 4401-09 (McKinney's); 8 N.Y.C.R.R. §§ 200.1, et seq. State law does not require provision of a sign language interpreter for deaf children. The state's plan outlining its policy and procedure for education of handicapped children pursuant to the Act has been approved by the United States Commissioner of Education.
 
 
 27
 Amy Rowley attends the Furnace Woods School in the Hendrick Hudson Central School District, where she commenced as a kindergarten pupil in 1977 and has progressed through the first grade into the second. She is largely deaf, but can distinguish vowel sounds and has significant residual hearing in the lower frequencies. The record is clear beyond dispute that the school authorities, in their efforts to comply with applicable state and federal laws, have made Herculean efforts to provide Amy with an education suitable to, and compensating for, her hearing deficiency, and that their efforts have so far met with remarkable success. With her deaf parents' approval, she was from the outset placed in a regular classroom setting. In anticipation of Amy's arrival, those teachers and administrators who would be communicating with her as the school's only deaf child took a special course in sign language. The School District purchased a teletype system to communicate visually with her parents, who are also deaf. After she was tested to determine her hearing level, she was provided with supplemental educational services, including the regular services of a speech therapist. After trying several hearing aids it was decided that she should be furnished with an "Earmark F.M. Wireless," a discrete sound amplifying device which increases particular sounds but blocks out background noise. This has been successfully used by her.
 
 
 28
 To assay whether Amy would benefit from sign language interpretation the Board of Education of the Hendrick Hudson Central School District (the District) from February 27 to March 10, 1978, placed a sign language interpreter, Jack Janik, with her in her classroom. At the conclusion of his testing period the interpreter reported that she was functioning like any of the nonhandicapped children in the room and that she resisted interpretation, looking to the teacher rather than the interpreter and asking the teacher rather than the interpreter to repeat anything she did not understand. To the same effect Amy's first grade teacher, Regina Gloverman, testified before the state hearing examiner that when Amy's tutor for the deaf, Susan Williams, used sign language to tell Amy what Mrs. Gloverman was saying in class, Amy looked to Mrs. Gloverman, who uses sign language in communicating with Amy, rather than to the sign language interpreter for what was being said. When Amy was subjected to a sign language interpretation test in her second grade classroom by Dr. Norman Doctor, who acted as the teacher with Edward Cortez as sign language interpreter, she looked to Dr. Doctor, asking him to repeat whatever she failed to understand, rather than to the sign language interpreter.
 
 
 29
 In view of the foregoing lack of success in using the services of a sign language interpreter in the education of Amy, her school district concluded that one should not be provided in her case. Susan Williams, the teacher of children with impaired hearing who was Amy's language tutor, testified on the basis of her working closely with Amy daily that a sign language interpreter would not make a significant difference in Amy's education but would, on the contrary, deter her interactions with her teacher and other children in the classroom. This testimony was corroborated by Ellen Garzione, a hearing therapist who worked with Amy three times a week for a half-hour each session, that a sign language interpreter would not be of any assistance to Amy, since she was achieving as well as, or better then, most other first graders. In the light of this persuasive evidence the Committee on the Handicapped of Amy's School District sensibly concluded that at least for the time being the appropriate education for Amy, tailored to her unique needs, was to continue with the supplemental services she was currently receiving, including teachers who had developed special knowledge in education of the deaf, the use of the F.M. Wireless set, one hour of instruction daily by a certified teacher of the deaf, and three hours of instruction weekly by a speech therapist.
 
 
 30
 For the most part these witnesses called by the defendants testified on the basis of their personal observation of Amy and assessment of her special needs and performance. Among the factors considered by them was her residual hearing (her father testified that it was "50%"), her performance on achievement tests, her development of facility at lip-reading, her ability to understand what was transpiring in her class, and her classroom activities. She is able to read and spell, to handle mathematics and help other children having difficulty, to score well in tests, and to gain a friendly cooperative acceptance on the part of her teacher and fellow-students. An expert audiologist, Dr. Ann Mulholland, testified on the basis of her clinical experience with Amy's case that her education was appropriate and adequate.
 
 
 31
 In contrast to defendants' witnesses, none of the witnesses called by the plaintiff (either in the state administrative proceeding or at the later district court trial) testified on the basis of any personal observation of Amy in the classroom or knowledge of her individualized needs and activities. Instead, despite the statutory scheme of the Act, which prescribes a special program to suit each child's unique education needs, 20 U.S.C. §§ 1401(19). 1414(a)(5), they relied on the general principle that the best education for any deaf person is the "total communication" method, which includes sign language as one of its parts. In their view, which was accepted by the district court, "every deaf child fares better in class with an interpreter. 'Every' deaf child includes Amy Rowley." Their conclusion was based entirely on general formulations and guidelines, without reference to Amy's individual needs.
 
 DISCUSSION
 
 32
 At the outset it should be noted that Judge Broderick premised his opinion on two basic errors. One is his misconception that "The Act itself does not define 'appropriate education'." On the contrary, the Act and regulations promulgated thereunder do define the term, see pp. 946-947, supra, and also define the terms "special education" and "related services" as used in the definition of "free appropriate education." For present purposes, the important aspects of these definitions is that they (1) emphasize that the education "meet the standards of the State educational agency," (2) specify that the education be tailored to the "unique needs of (the) handicapped child" in each instance, and (3) nowhere mention or suggest use of a sign language interpreter, despite referring to specific services and devices that might be used in treating children with hearing loss (e. g., "lip-reading," "determination of the child's need from group and individual amplification, setting and fitting an appropriate aid").
 
 
 33
 Thus the scope and range of an appropriate education is left primarily to the states, which are given broad authority to prescribe the details of educational policy in individual cases and must present specific plans for approval to the United States Commissioner of Education who, if he finds that a state's plan is not in conformity with the Act and federal regulations thereunder, may withhold funding, with the state given a right of appeal to a federal court of appeals, 20 U.S.C. § 1416. See, e. g, Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities").
 
 
 34
 Pursuant to the Act the State of New York has adopted parallel legislation and the State Commissioner has promulgated specific regulations which do not require provision of a sign language interpreter. Moreover the state's plan for education of handicapped children, which does not provide for sign language interpreters, has been approved by the federal Commissioner. In view of the approved plan's specificity with respect to audiology services, and the statute's policy in favor of administrative determination of what services are appropriate, a very strong showing is required to depart from that policy. The showing here does not meet that test.
 
 
 35
 The second basic erroneous premise underlying Judge Broderick's decision was his use of a definition of "appropriate education" found in regulations promulgated under an entirely different statute that does not apply here, the Rehabilitation Act of 1873, Pub. 93-112, 29 U.S.C. §§ 701, et seq., see 45 C.F.R. 84.33(b), which is designed to promote gainful employment for handicapped persons by developing rehabilitative services on an equal, non-discriminatory basis. Unlike the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401, et seq., which governs the present case, the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, et seq., contains provisions for vocational rehabilitation services which specifically include services of sign language interpreters, 29 U.S.C. §§ 774(d), 777e, showing that when Congress wished to provide such services it knew how to do so.
 
 
 36
 Unaware of the Act's definition and using a definition found in a regulation promulgated under a different Act for a different purpose, Judge Broderick formulated a new standard "that each handicapped child be given an opportunity to achieve his full potential commensurate with the opportunity provided to other children" which he borrowed from a law review note, The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103, 1125-26 (1979). No support for this definition is to be found in the Act, its legislative history, or in regulations promulgated thereunder. Had Congress intended such a definition it would have enacted it rather than the one which was adopted in 20 U.S.C. § 1401(18), supra. The legislative history of the Act reveals that Congress was simply concerned with insuring that handicapped children would become independent, productive citizens rather than that their potentials be compared with those of the non-handicapped. The Senate Report on the proposed legislation states:
 
 
 37
 "With proper education services, many would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society." S.Rep.No.94-168, 94th Cong., 1st Sess., reprinted in (1975) U.S.Code Cong. and Admin.News, pp. 1425, 1433.
 
 
 38
 This objective is confirmed by statements by various senators during debates on the bill.[2] In short, the aim of the Act is to develop a handicapped child's self-sufficiency.
 
 
 39
 The definition of "appropriate" education adopted by the district court, moreover, is unfeasible and imposes a standard that is impractical, if not impossible, to use as a means of evaluating the appropriateness of a handicapped child's education. The district court indulged in understatement when it observed:
 
 
 40
 "The difficulty with the standard, of course, is that it depends on a number of different measurements which are difficult to make. It requires that the potential of the handicapped child be measured and compared to his or her performance, and that the resulting differential or 'shortfall' be compared to the shortfall experienced by non-handicapped children."
 
 
 41
 Attempting to evaluate an individual child's potential is an extremely difficult task, involving much speculation. "The response to almost any interesting question concerning the education of the handicapped is either that the answer is unknown or that no generalizable beneficial effect of a given treatment can be demonstrated," Kirp, Buss & Kuriloff, Legal Reform of Special Education: Empirical Studies and Procedural Proposals, 62 Cal.L.Rev. 40, 47 (1974). The district court's definition would compound this problem by requiring educators to subject all nonhandicapped children in the same school district, or at least in the same class, to a battery of tests in an effort to determine their potentials and their relative shortfalls as compared with that of the handicapped child. The process, while theoretically possible, obviously imposes an impossible burden.
 
 
 42
 The language and legislative history of the Act demonstrate that Congress visualized a much more practical objective, i. e., an education for each handicapped child that would enable the child to be as free as reasonably possible from dependency on others, would enable the child to become a productive member of society, and would hopefully promote academic achievement by the child that would roughly approximate that of his or her nonhandicapped classmates. A child's unique needs are met whenever the child's IEP enables the child to meet those goals. See, in accord, Armstrong v. Kline, 476 F.Supp. 583, 604 (E.D.Pa.1979). Judged by this standard, the IEP for Amy clearly complies with the Act without her having a sign language interpreter. She has an IQ of 122. Her scores on the Stanford Achievement and Metropolitan Achievement Tests are above her grade level and show that she is living up to the potential indicated by her IQ. Although one debatable test indicates she hears only 59% of the words spoken in class, her classmates probably hear substantially less than 100% due to inattention, daydreaming, and other causes.
 
 
 43
 The most important fact for our purposes is that Amy is performing academically above the median of her class, will become a productive member of society, and is well adjusted to her school, teacher and classmates. The district court's statement that her "IQ does not represent the full measure of her potential" is a generality, supported only by the suggestion of persons who never witnessed her in a classroom context, and thus are reduced to speculation. On the opposite side of the ledger is the view that provision of a sign language interpreter would not prepare her for later life in a world where she will not have such an interpreter available at her elbow but will be forced to achieve self-sufficiency in society through lip-reading and maximization of the effectiveness of her residual hearing.
 
 
 44
 Since application of the proper standard could yield but one result, the action in my view should have been dismissed. But if doubt on that score existed, the proper procedure here, where there is substantial evidence pointing in different directions on the issue of whether Amy needed a sign language interpreter, was for the district court to remand her case to the state educational authorities for findings and conclusions based on application of the correct standard, before resolving the issues presented by this lawsuit. The rationale of this procedure is obvious: the state educational personnel have far more experience and greater expertise in this difficult area than does a district court. Appraisal of the evidence by those possessing superior capacity to do so, who would recommend disposition based on application of the correct standard would not only be of invaluable assistance to the court but would avoid the flood of litigation that may be expected in cases where the state educators have initially denied a child's application. Without denying the child the "second bite at the cherry" authorized by the Act, 20 U.S.C. § 1415(e)(2), this step also has the virtue of being consistent with the normal judicial procedure of allowing expert agencies the first opportunity to resolve difficult technical issues within the areas of their expertise. See, e. g., Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). In making determinations based on specialized knowledge federal courts usually are less inclined to substitute their judgment for conclusions of a specially trained hearing examiner than they otherwise would be.
 
 
 45
 Lastly, the district court erred in admitting into evidence and relying on certain additional hearsay proof directly relevant to the issues before it, prior to deciding the case. At trial the plaintiffs offered into evidence certain affidavits (Nancy Rowley, Mary Sheie and Michael Deninger) bearing on the question of whether Amy required a sign language interpreter, which had been excluded from the state record because they had been submitted after that record had been closed, 8 N.Y.C.R.R. 200.5(c)(8)(10).[3] On October 5, 1979, Judge Broderick sustained objections to the affidavits as hearsay and as not properly part of the record before the State Commissioner of Education but allowed plaintiffs to brief the issue of admissibility in their post-trial memorandum. As a result the defendants took no steps to call the affiants for cross-examination or to offer rebuttal proof, since there was no need to do so. More than three months after the trial had been completed, upon filing his decision on January 15, 1980, Judge Broderick simultaneously reversed himself, holding that, although the affidavits would be objectionable as hearsay if offered in the first instance in the district court, the State Commissioner had erred in not admitting and considering them pursuant to 8 N.Y.C.R.R. 279.4,[4] which allows a party filing a petition to file "additional documentary evidence." He concluded that he had therefore considered the evidence as part of the record before the state educational agency.
 
 
 46
 This was patently error, amounting to a denial of due process. Had the evidence been properly introduced and admitted in the state proceedings the defendant Hendrick Hudson Central School District would have been afforded the opportunity to cross-examine the three affiants and offer rebuttal proof. But since it was excluded there for late filing, no such opportunity ever existed. Similarly, because of the district court's exclusion of the evidence until it decided the case, the defendant School District never had the opportunity in the federal proceeding to exercise this basic right. The effect was to decide the case on the basis of untested, unrebutted affidavits, which is improper.
 
 
 47
 The majority's holding that this error may be disregarded on the ground that there is sufficient evidence to uphold the district court's decision "without reliance on the affidavits" (majority opinion, fn. 6), simply will not hold water. The affidavits were essential to the plaintiff's case because they constituted the only evidence in favor of the plaintiff's position which was based on observation of Amy, as distinguished from testimony plaintiff had introduced of witnesses who had never seen her in or out of the classroom and were basing their opinions on general views regarding the advantages of the "total communication" theory. Defendants, on the other hand, offered numerous witnesses who testified on the basis of their personal observations of Amy that she was receiving an appropriate education. Moreover, the importance of the affidavit evidence was recognized by Judge Broderick, who stated:
 
 
 48
 "The testimony of the plaintiffs' experts, however, was clearly applicable to Amy. Two of the affidavits submitted were from experts who had actually observed Amy in class and were able to express opinions concerning her education specifically. (See affidavits of Michael Deninger and Mary Sheie.)."
 
 
 49
 Since Judge Broderick actually relied on the affidavits we are in no position to state what his opinion would have been if they had not been erroneously admitted and considered by him.
 
 
 50
 For the foregoing reasons, I would reverse the judgment below with directions to dismiss the complaint, or, in the alternative, with directions to refer the issues to the state educational authorities for further findings and recommendations according to the proper standard, with the Rowley, Deninger and Sheie affidavits to be excluded unless defendants are afforded the opportunity to cross-examine them and to offer rebuttal evidence.
 
 
 
 *
 Hon. Dudley B. Bonsal, Senior United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Unless otherwise stated, all statutory citations in this opinion are to sections of the Act as codified in 20 U.S.C
 Section 1414(a)(5) provides:
 "(T)he local educational agency or intermediate educational unit will establish, or revise, whichever is appropriate, an individualized education program for each handicapped child at the beginning of each school year and will then review and, if appropriate, revise its provisions periodically, but not less than annually".
 In September 1978, when Amy entered the first grade, her program was prepared by the School District's Committee on the Handicapped and her teacher. Under the program Amy was placed in a regular classroom and was provided with an FM wireless hearing aid. She was assigned to a one hour session each day with a tutor for the deaf and three hour-long sessions each week with a speech therapist.
 The same services are still being provided. Although Amy is now in the second grade, the issue presented in this case is the same for both school years.
 
 
 [2]
 Procedural safeguards for the provision of free appropriate public education to handicapped school children are set forth in Section 1415
 Following the procedure established by the State of New York, the Rowleys first requested the District's Committee on the Handicapped to reconsider its recommendation. When the Committee finally refused to recommend that an interpreter be provided, the Rowleys appealed to an Independent Hearing Officer. The Officer upheld the decision of the Committee. His decision was appealed by the Rowleys to the Commissioner of Education of the State of New York.
 
 
 [3]
 Section 1415(e)(2) provides:
 "Any party aggrieved by the findings and decision made (in the administrative proceedings pursuant to § 1415) shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."
 
 
 [4]
 The Act requires that all state and local educational agencies which receive funds under the Act provide each handicapped child with a "free appropriate public education". Sections 1412(1), 1414(a)(1)
 A "free appropriate public education" is defined in Section 1401(18) as
 "special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate pre-school, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title."
 Appellants concede that the definition of "special education", Section 1401(16), and "related services", Section 1401(17), and regulations promulgated pursuant to the Act, are sufficiently broad to encompass a sign language interpreter. Appellants nevertheless claim that an interpreter is not required in Amy's case.
 
 
 [5]
 This is a different standard of proof than that which originally had been proposed. The initial bill passed by the House had provided that the determination of the state agency would be "conclusive in any court of the United States if supported by substantial evidence ...." H.R.7217, 94th Cong., 1st Sess., reprinted in H.R.Rep.No.332, 94th Cong., 1st Sess. 56 (1975)
 
 
 [6]
 Appellants also bring up for review the district court's ruling which admitted in evidence three affidavits which were attached to appellees' petition for review by the Independent Hearing Officer, but were not considered by him. We find it unnecessary to reach this claim, since the statutory standard of proof by a preponderance of the evidence has been complied with in this case without reliance on the affidavits
 
 
 [7]
 A majority of the panel of this Court which heard this appeal on May 1, 1980 voted shortly thereafter to affirm the judgment of the district court and to do so pursuant to a provision of the Rules of our Court which would preclude citation of our decision as authority in any other case, thus recognizing what we believe to be the lack of precedential character of our decision in view of the unique facts of this case. We continue to adhere to that view
 
 
 [1]
 Title 20 U.S.C. § 1412(1) provides:
 " § 1412. Eligibility requirements
 "In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner that the following conditions are met:
 "(1) The State has in effect a policy that assures all handicapped children the right to a free appropriate public education."
 
 
 [2]
 On June 18, 1975, Senator Williams, during the debates on the proposed Act, stated that
 "providing appropriate educational services now means that many of these individuals will be able to become a contributing part of our society, and they will not have to depend on subsistence payments from public funds." 121 Cong.Rec. 19492 (1975).
 In debates with respect to the Conference Report on the Act he supported the previously expressed views of the Secretary of Health, Education and Welfare, stating that the goal of the Act was to enable handicapped persons to become "productive citizens, capable of contributing and even more, capable of self respect and pride which they so rightly deserve." 121 Cong.Rec. 37416 (1975). These views were endorsed by Senator Randolph, who stated that the bill must be passed "to give these children the educational services they need to compete in today's changing world." 121 Cong.Rec. 37410 (1975).
 In the House Congressman Harkin expressed the same views, stating
 "With proper educational services provided now, at a young age, these children can become productive citizens, contributing to society instead of being left as burdens on our society." 121 Cong.Rec. 25541 (1975).
 
 
 [3]
 8 N.Y.C.R.R. § 200.5(c)(8)(10) provides in pertinent part:
 "(c) . . . an impartial, formal hearing . . . shall be conducted in accordance with the following rules:
 "(8) The parents, school authorities and their respective counsel shall have an opportunity to present evidence and to confront and question all witnesses at the hearing. Each party shall have the right to prohibit the introduction of any evidence the substance of which has not been disclosed to such party at least five days before the hearing.
 "(10) The impartial hearing officer shall render a decision and mail a copy of the decision to the parents and to the Board of Education not later than 45 calendar days after the receipt by the Board of Education of a request for a hearing. The decision of the impartial hearing officer shall be based solely upon the record of the proceeding before the impartial hearing officer, and shall set forth the reasons and the factual basis for the determination. . . ." (Emphasis supplied).
 Accordingly the State Commissioner of Education based his decision upon "a review of the record before the hearing officer," in accordance with the Act, 20 U.S.C. § 1415(c), which provides that the State educational agency "shall conduct an impartial review of such hearing."
 
 
 [4]
 8 N.Y.C.R.R. § 279.4, upon which the district court relied, provides:
 "279.4 Initiation of Review. The party seeking review shall file with the Office of Counsel of the State Education Department the petition for review including any written argument, memorandum of law, and additional documentary evidence, and the notice of intention to seek review where required, together with proof of service of a copy of such documents upon the other party to the hearing."
 When read in context with other portions of § 279 it seems clear that the "additional documentary evidence" refers to exhibits that had been offered before or admitted by the Impartial Hearing Officer but not included in the appellate record furnished by the local board of education or school district, which is only required to file "A copy of the transcript and of the decision of the hearing officer," 8 N.Y.C.R.R. § 279.2.
 The district court's interpretation not only clashes with 8 N.Y.C.R.R. § 2005(c)(8)(10) but would permit a petitioner to obtain a trial de novo before the Commissioner of Education based on affidavits submitted under the guise of "documentary evidence" which had never been considered, tested by cross-examination or rebutted before the Hearing Officer. Nothing in 8 N.Y.C.R.R. § 279.4 indicates that affidavits were intended to be included in the term "documentary evidence." Nor does the regulation obligate the Commissioner to accept or give any weight to untested affidavits belatedly submitted.
 The injustice of the district court's interpretation in the present case is readily apparent. Nothing prevented the petitioners from submitting the affidavits or live testimony by the affiants to the Hearing Examiner. Nor do the State Commissioner's regulations preclude petitioners who are surprised by any of a Hearing Examiner's findings or conclusions from moving to reopen the hearing and record in order to accept the new affidavits and give the defendants an opportunity to call the affiants for cross-examination or to submit rebuttal testimony or other proof. But to submit the new affidavits at the appellate level deprives the defendants of these basic rights. The Act and the state regulations clearly contemplate a complete trial before the Hearing Examiner and a review by the Commissioner, not a second trial before the Commissioner.