Travis BROUGHAM, a minor, by Angela BROUGHAM, his parent and next friend, Plaintiff,

v.

TOWN OF YARMOUTH and State of Maine, Department of Education, Defendants.

Civ. No. 91–0322–P–C.

United States District Court, D. of Maine.

May 28, 1993.

Richard O'Meara, Murray, Plumb & Murray, Portland, ME, for plaintiff.

F. Paul Frinsko, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Town of Yarmouth.

Peter Stewart, Asst. Atty. Gen., Augusta, ME, for State of ME.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

Plaintiff, Angela Brougham ("Ms. Brougham"), brings this action for her son, Travis Brougham, a thirteen year-old deaf child in

the Yarmouth school system, under the Individuals with Disabilities Education Act (IDEA, formerly the Education for All Handicapped Children Act, the EAHCA, or the EHA), 20 U.S.C. §§ 1400 *et seq.*, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Specifically, in Count I, Plaintiff alleges that the individualized education plan (IEP [1]), as initially proposed by the Town of Yarmouth ("the Town") and as modified by the hearing officer, fails to provide Travis with the free appropriate public education to which he is entitled under the IDEA. In Count II, Plaintiff alleges that the IEP, as originally proposed and as modified, is not designed to meet the individual needs of Travis as adequately as the needs of nonhandicapped persons are met and, therefore, fails to provide Travis with an appropriate education, pursuant to 29 U.S.C. section 794 and 34 C.F.R. section 104.33(b).

## BACKGROUND

This case arrives in United States District Court subsequent to a state special education due process hearing. Pursuant to her rights under the statute, in the summer of 1991, Ms. Brougham withdrew her consent to the proposed Yarmouth IEP and applied for a special education due process hearing to review the appropriateness of the Yarmouth IEP. Such hearing was held on August 27 and 30, 1991, at the Town Meeting House in Yarmouth, Maine. Ten witnesses gave testimony and forty documents were entered in evidence before Hearing Officer Carol B. Lenna.

The hearing officer found the facts to be as follows:

1. Travis has been educated in the mainstream since first entering public school in 1984. He became a student in [the Yarmouth school system] in 1987. A review of his educational history shows slow but steady progress in programs which have included individual instruction and classroom instruction with a cued speech interpreter [2]. Travis' expressive and receptive language development and vocabulary acquisition have been a concern throughout his educational history. It is estimated that there is currently a four to five year gap between Travis' language skills and those of his sixth grade hearing peers. (Testimony: Mazzola, Vandermast, Earl; Ex. 4, 7, 8)

2. Travis began wearing hearing aids in June 1981, and began speech therapy and cued speech in July 1981. Sound amplification and a cued speech interpreter have been part of his instructional program at least since 1987. (Ex. 3)

3. The use of sign language to augment Travis' language acquisition has been suggested since 1988. Observations at that time indicated a concern for Travis's ability to function in a classroom given his gaps in language, a concern that his language base was insufficient to use cued speech effectively, and that the amount of individual instruction required by Travis was isolating for him. Ms. Brougham has consis-

---

1. As 20 U.S.C. § 1401(a)(20) explains:
   The term "individualized education program" means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency ... which statement shall include—
   A) a statement of the present levels of educational performance of such child;
   B) a statement of annual goals, including short-term instructional objectives;
   C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs;
   D) a statement of the needed transition services for students beginning no later than age 16 and annually thereafter (and, when determined appropriate for the individual, beginning at age 14 or younger), including, when appropriate, a statement of the interagency responsibili-

   ties or linkages (or both) before the student leaves the school setting;
   E) the projected date for initiation and anticipated duration of such services; and
   F) appropriate objective criteria and evaluation procedures, and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. (footnote omitted).

2. Cued speech is used to facilitate communication for the oral hearing impaired. "Cued speech is a system whereby gestures are used to make more visible sounds that are not visible or look [a]like through lipreading. It is not sign language. It is not gesturing entire words. It is gesturing sounds within those words." (O'Connell, 8/27/91 Trans., pp. 25–26).

tently rejected suggestions that sign language be introduced or that partial-day placement at Baxter School for the Deaf be considered. (Testimony: Vandermast; Ex. 6, 7, 8, 10, 12, 15, 16, 17, 25, 27)

4. In grades 4 and 5, gradual but consistent progress was noted in progress reports and teacher observations. No significant change in program is apparent, although the proficiency of the cued speech interpreter was noted by several observers. (Testimony: Carter, Vandermast, L. Smith; Ex. 22, 24, 26, 28, 29, 630)

5. In 1988, Travis is evaluated and found to "display a profile similar to that of a hearing impaired student with concurrent learning disability." In 1991, the Clarke School for the Deaf evaluation of Travis stated that "the results ... indicate that Travis ... does not exhibit any behaviors typical of a student with a learning disability." (Ex. 17, 34)

6. Observations and evaluations note that Travis is an inconsistent and sometimes inaccurate cuer but that his skills have improved. Travis' mother is described as a fluent cuer. His cued speech interpreter is described as highly proficient. (Testimony: Mazzola, Vandermast; Ex. 7, 17, 29, 33)

7. In May 1991, Travis was evaluated by the Clarke School for the Deaf. The evaluation was extensive, including an audiological assessment, speech assessment, psychological assessment, language assessment, and an academic assessment. The evaluation confirmed Travis' severe language deficit. The report noted that he does not have the language skills necessary for successful mainstreaming into the sixth grade with his hearing peers. It was also noted that Travis' understanding of language appears to increase when he is provided with interpreting through cued speech.

Among other things, the speech assessment noted that "the effectiveness of Travis' communication attempts ranged greatly depending on the amount of supplemental information available to the listener." "Since [he] exhibited significant speech production errors, it was essential to rely on other factors to understand his speech." The academic assessment places Travis well below grade level in reading, with reading comprehension at approximately a 2.6 grade level. Math computation was on grade level. The summary includes three pages of educational recommendations to address Travis' educational deficits.

The psychological examiner comments on feelings of anger and frustration which Travis "may possess." However, an objective behavior rating scale indicates that in the school setting, Travis presents himself with average to above average levels of social and emotional adjustment. She also notes that Travis "appears to gain a great deal of esteem and confidence form his participation in sports activities, and he appears to gain much security through his positive relationships with his mother, teachers, and peers."

The individual assessment summaries detail a number of specific interventions to address Travis' identified deficits. In the conclusion, the evaluation recommends that Travis should be placed in a full-time program for oral hearing impaired students. (Ex. 34)

Special Education Due Process Hearing Decision, pp. 3–4.

The hearing officer issued her decision on September 18, 1991, and ordered that:

1) the Yarmouth pupil evaluation team ("PET") meet within fifteen days of the decision "to modify the present IEP to review present evaluative material and include any additional goals and objectives deemed necessary to address Travis' need to increase language acquisition;" and

2) the IEP shall include "partial placement at the Baxter School for the Deaf for the English/Reading, and Science/Social Studies contents of Travis' program," with a cued speech interpreter in attendance at both locations.

Special Education Due Process Hearing Decision, pp. 5–6. In response to the hearing officer's order, Yarmouth modified Travis's IEP. The revised IEP, which is at issue in the case at bar, provides for Travis's school day to be divided between mainstream in-

struction at Yarmouth school and a total communication program at the Baxter School for the Deaf ("Baxter").[3] A cued speech interpreter would be provided at each facility.

Pursuant to 20 U.S.C. section 1415(e)(2), Plaintiff seeks judicial review of these administrative findings. The stated purpose of the IDEA is to afford all children with disabilities a "free, appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). The parties disagree sharply over whether the revised IEP constitutes an "appropriate" education for Travis as required by statute.[4] Plaintiff alleges that the revised IEP, which splits Travis's school hours between mainstream classes at Yarmouth public school and a total communication program at Baxter School for the Deaf, fails to provide an "appropriate" education for Travis because Travis is an oral child in need of intensive oral language train-ing integrated throughout his curriculum, as well as exposure to other oral hearing impaired children, neither of which is adequately provided in the proposed IEP.[5] Further, Plaintiff fears that instead of focusing on closing up the holes in his linguistic development, Travis will be immersed in a whole new mode of communication (sign language) which will distract him from the more immediately necessary language exercises.[6] Plaintiff argues that, given his specific educational needs, the only appropriate educational placement for Travis is a full-time oral program for the hearing impaired, the closest of which is the Clarke School for the Deaf ("Clarke" or "the Clarke School") in Northampton, Massachusetts. Such a placement, and the intensive language development program it encompasses, would be necessary, they argue, only for a few years, after which Travis could return to a mainstream classroom.

3. Travis's schedule would be as follows:

8:15–11:00 Yarmouth Intermediate School
11:15–2:20 Baxter School for the Deaf
YARMOUTH
8:15–8:30 Homeroom
8:30–9:10 Pre-teaching twice a week. The remainder would be for [mainstream] Music, Art, and Physical Education.
9:10–9:55 Math (mainstream)
10:00–10:40 Reading/Literature (mainstream)
10:40–11:00 Recess
11:00 Yarmouth to transport Travis to Baxter
BAXTER
11:19–11:45 Lunch
11:47–12:27 Language Arts/Reading
12:30–1:10 Science
1:13–1:53 Social Studies
1:55–2:20 Speech Therapy twice a week
Study Skills three times a week
Yarmouth School Department, P.E.T. Minutes, October 1, 1991, p. 2.

4. Because both [the IDEA and section 504 of the Rehabilitation Act] are built around fundamental notions of equal access to state programs and facilities, their substantive requirements, as applied to the rights of a handicapped child to a public education, have been interpreted to be strikingly similar. In regulations promulgated pursuant to section 504, the Secretary of Education has interpreted section 504 as requiring a recipient of federal funds that operates a public elementary or secondary education program to provide a free, appropriate public education to each qualified handicapped person in the recipient's jurisdiction. 34 C.F.R. § 104.33(a) (1983).

*Smith v. Robinson,* 468 U.S. 992, 1017, 104 S.Ct. 3457, 3471, 82 L.Ed.2d 746 (1984). Thus, this Court's analysis of whether the proposed IEP provides Travis with a "free appropriate education" addresses Plaintiff's claims under *both* statutes.

5. In an oral program, hearing impaired students are taught to lip read, to use their residual learning, the remaining hearing that they have, to use hearing aids to try to exploit even a small amount of hearing, and they are taught to develop language skills orally and in writing. In a total communication program, total communication means using sign language and speech reading and lip reading. In that kind of program, students are taught to use sign language and to understand sign language.
(O'Connell, 8/27/91 Trans., p. 22) (Joanne O'Connell was the coordinator of the Clarke Evaluation Team who performed the comprehensive educational evaluation on Travis in May of 1991).

6. Describing the disadvantages of a total communication program for Travis at this time, Joanne O'Connell explained:
[T]he down side is that in many total communication programs, most studies have shown that reading development does not happen at the same rate as it does with oral communication program[s]. That in many programs, in practice, the oral component of total communication is ignored or it is not focused on, and studies have also shown that students tend to focus more on the sign language rather than the oral component because it is easier.
(O'Connell, 8/27/91 Trans., p. 97).

The Town counters that the proposed IEP does provide Travis with an appropriate education as mandated by statute. The Town argues that dual placement in both Yarmouth public school and Baxter School for the Deaf ("Baxter") incorporates the statute's strong legislative preference for mainstreaming, places Travis in the least restrictive environment, and provides Travis with what is statutorily required—a reasonable opportunity to derive educational benefits. Further, the Town argues that this is really a case about educational methodology, and, under the IDEA, such questions are to be determined by state and local education officials.

## JUDICIAL REVIEW

Under the statute itself, the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The parties agreed to enter stipulations and allow the Court to determine the issues on the administrative record and stipulations before it.[7] December 30, 1992, Procedural Order (Docket No. 42).

In the seminal case under the IDEA, *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court interpreted section 1415 of the IDEA to require a two-fold inquiry by the reviewing court. "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed throughout the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206–207, 102 S.Ct. at 3051. In the case at bar, Plaintiff does not challenge the procedural safeguards; hence, this Court will focus solely on whether the IEP is reasonably calculated to enable Travis to receive educational benefits.

The Court of Appeals for the First Circuit described the level of review provided by the reviewing court as "something short of a complete *de novo* review of the state educational program." *G.D. v. Westmoreland School District*, 930 F.2d 942, 945 (1st Cir. 1991) (quoting *Colin K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983)). " '[T]he Act contemplates that the source of evidence generally will be the administrative hearing record, with some supplementation at trial,' and obligates the court of first resort to assess the merits and make an 'independent ruling based on a preponderance of the evidence.' " *Roland M. v. Concord School Committee*, 910 F.2d 983, 989 (1st Cir.1990) (quoting *Burlington v. Department of Education*, 736 F.2d 773, 790 (1st Cir.1984)) (hereinafter *Burlington II*), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately "left to the discretion of the trial court." *G.D.*, 930 F.2d at 946 (quoting *Burlington II*, 736 F.2d at 792). Thus, courts must render what the First Circuit Court of Appeals has called a "bounded, independent decision[ ]—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Burlington II*, 736 F.2d at 791.

## ANALYSIS

### A. Additional Findings of Fact

After carefully reviewing the administrative record, this Court agrees with the findings of fact submitted by the hearing officer and adopts them herein for purposes of its analysis. The Court adds the following findings of fact:

1. Born on August 16, 1979, Travis Brougham has a profound hearing impairment in both ears as a result of meningitis

---

7. The parties stipulate to the following: Travis is a "child with disabilities" within the meaning of 20 U.S.C. § 1401(a) and 34 C.F.R. § 300.5; Travis is an "exceptional student" within the meaning of 20-A M.R.S.A. § 7001(2) and the Maine

Special Education Regulations, ch. 101; Travis is a "qualified individual with handicaps" within the meaning of § 504 of the Rehabilitation Act of 1973. Stipulations (Docket No. 34).

contracted at the age of eighteen months. (Ex. 34)

2. Travis has consistently performed without significant difficulty in the following mainstream classes: math, art, music and physical education. Travis has had difficulty, particularly with vocabulary, in the following mainstream classes: science and social studies.

(Testimony: L. Smith, Carter; Ex. J–15, J–23, J–25, J–26, J–32, J–30, J–36)

3. Parents of deaf children need to decide early on what mode of communication to choose for their child. Ms. Brougham decided that Travis should be an oral communicator as it would make fitting in and communicating with the hearing world more manageable. (Testimony: Brougham)

## B. The Importance of The Rowley Decision

As earlier discussed, the leading case interpreting the IDEA is *Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). *Rowley* concerned a deaf student, Amy Rowley, with minimal residual hearing who was an "excellent" lipreader. *Id.* at 184, 102 S.Ct. at 3039. When she entered first grade, the school district declined to provide her with a sign language interpreter. Her parents claimed that such denial constituted a denial of the "free appropriate education" guaranteed under the Act. *Id.* at 185, 102 S.Ct. at 3040. The district court found that, although Amy "performs better than the average child in her [mainstream] class and is advancing easily from grade to grade," *Rowley v. Hendrick Hudson District Board of Education,* 483 F.Supp. 528, 534 (S.D.N.Y.1980), "she understands considerably less of what goes on in class than she could if she were not deaf." *Id.* at 532. This disparity between Amy's achievement and her potential led the district court to decide that she was not receiving a "free appropriate education," which the court defined as "an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children." *Rowley*, 458 U.S. at 185, 102 S.Ct. at 3040 (quoting *Rowley*, 483 F.Supp. at 534). A divided panel of the Court of Appeals for the Second Circuit affirmed. *Rowley v. Hendrick Hudson District Board of Education,* 632 F.2d 945 (2d Cir.1980). The Supreme Court disagreed with the lower courts' rulings and held that:

in light of [the finding that Amy is receiving an 'adequate' education, since she performs better than the average child in her class and is advancing easily from grade to grade] and of the fact that Amy is receiving personalized instruction and related services ... the lower courts should not have concluded that the Act requires the provision of a sign-language interpreter.

*Id.* 458 U.S. at 210, 102 S.Ct. at 3052–53.

Although the Court explicitly limited its holding to the facts before it, *id.* at 202, 102 S.Ct. at 3049, the Court's interpretation of the IDEA provides clear instruction for lower courts wrestling with specific provisions of the statute. The Court emphasized that the goal of the IDEA was not to maximize each handicapped student's potential, but rather, more basically, to provide access to public education. *Id.* at 192, 102 S.Ct. at 3043 ("[T]he intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside"). "Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer *some educational benefit* upon the handicapped child." *Id.* at 200, 102 S.Ct. at 3048 (emphasis added).[8]

## C. Questions of Methodology and Parental Preference

The Supreme Court was similarly clear about its preference that courts not get in-

---

8. Countering the dissent's argument that the statute was designed to maximize a handicapped student's potential, the majority explained, "Not only are we unable to find any suggestion from the face of the statute that the requirement of an 'appropriate education' was to be limitless, but we also view the dissent's approach as contrary to the fundamental proposition that Congress, when exercising its spending power, can impose no burden upon the States unless it does so unambiguously." *Rowley*, 458 U.S. at 190, n. 11, 102 S.Ct. at 3042, n. 11.

volved in making what are primarily decisions about educational theory and methodology. *Id.* at 206, 102 S.Ct. at 3051. The Supreme Court warned:

> in assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child. The Act expressly charges States with the responsibility of 'acquiring and disseminating to teachers and administrators of programs for handicapped children significant information derived from educational research, demonstration, and similar projects, and [of] adopting, where appropriate, promising educational practices and materials.' 20 U.S.C. § 1413(a)(3). In the face of such a clear statutory directive, it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to section 1415(e)(2).

*Id.* at 207–208, 102 S.Ct. at 3051. The Court clearly stated that "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Id.* at 208, 102 S.Ct. at 3052. In addition, "*Rowley* and its progeny leave no doubt that parents, no matter how well-motivated, do not have a right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." *Lachman v. Illinois State Board of Education,* 852 F.2d 290, 297 (7th Cir.1988), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988).

Defendants characterize the present dispute as simply that—a dispute between the parent and the Town over methodology: in this case, oral versus total communication. Plaintiff argues that to frame this case as simply a question of methodology is to ignore the integrated role that methodology plays in the development of an *individualized* education plan and placement appropriate for Travis, given his needs as an oral hearing impaired child.

■ It is clear that under the IDEA, parental preference alone cannot be the basis for compelling a school district to provide a certain educational plan for a handicapped child. *Lachman,* 852 F.2d at 297; *Gregory K. v. Longview School District,* 811 F.2d 1307, 1314 (9th Cir.1987) (appropriate placement proposed by school district must be upheld even if family prefers another alternative, which may be better for the child). The Court agrees with Plaintiff that questions of methodology cannot be analyzed as separate and distinct from the question of whether an IEP provides an appropriate education for an individual handicapped child. However, integrating questions of methodology into the analysis of the appropriateness of a proposed IEP does not change the standard regarding the appropriateness of the overall educational plan. Hence, the only proper focus of this Court's analysis continues to be whether the proposed IEP is reasonably calculated to provide Travis with educational benefits. *See Gregory K.,* 811 F.2d at 1315 ("Our *de novo* review ... must focus primarily on the district's proposed placement, not on the alternative that the family preferred. Even if the tutoring were better for Gregory than the district's proposed placement, that would not necessarily mean that the placement was inappropriate. We must uphold the appropriateness of the District's placement if it was reasonably calculated to provide Gregory with educational benefits.").

### D. Application of the Department of Education's 1992 Policy Guidance

Plaintiff places significant weight on the importance of the Department of Education's recently released "Deaf Students Education Services Policy Guidance," 57 Fed.Reg. 49274 (October 1992), as a yardstick by which this Court should measure the appropriateness of the proposed IEP. The Department explains that the policy guidance is "intended to furnish State and local education agency

personnel with background information and specific steps that will help to ensure that children and youth who are deaf are provided with free appropriate public education." *Id.*

Most notably, the Policy Guidance explains that "the Secretary believes that the unique communication and related needs of many children who are deaf have not been adequately considered in the development of their IEPs." *Id.* at 49275. The Policy Guidance goes on to state:

The Secretary [of Education] believes it is important that State and local education agencies, in developing an IEP for a child who is deaf, take into consideration such factors as:

1) communication needs and the child's and family's preferred mode of communication;

2) linguistic needs;

3) severity of hearing loss and potential for using residual hearing;

4) academic level; and

5) social, emotional, and cultural needs, including opportunities for peer interactions and communication.

In addition, the particular needs of an individual child may require the consideration of additional factors. For example, the nature and severity of some children's needs will require the consideration of curriculum content and method of curriculum delivery in determining how those needs can be met.

*Id.*

Plaintiff in the case at bar argues that the proposed IEP does not provide Travis with an appropriate education in that the IEP does not account for the criteria emphasized by the Department of Education in its Policy Guidance. The Court disagrees.

■ The construction of a statute by the administrative agency charged with its execution is normally given a measure of deference. *See, e.g., Savko v. Port Authority of Allegheny County,* 800 F.Supp. 268, 272 (W.D.Pa.1992) (considering the weight to be given to the EEOC's Policy Guidance regarding damages applications to pending and pre-Act conduct under the 1991 Civil Rights Act); *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844–845, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984) (analyzing the reasonableness of the EPA regulations regarding the implementation of permit requirements under the amended Clean Air Act). The Court is also charged with a duty to reject any administrative interpretation which is unreasonable. *Savko,* 800 F.Supp. at 272; *EEOC v. Arabian American Oil Company,* 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (rejecting EEOC's view with respect to the extraterritorial effect of Title VII); *General Electric Company v. Gilbert,* 429 U.S. 125, 141–142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976) (rejecting EEOC guidelines on pregnancy discrimination). This Court finds the Department of Education's Policy Guidance to be reasonable given the IDEA's mandate to assure all handicapped children a free, appropriate public education designed to meet their *unique* needs. 20 U.S.C. § 1400(c) (emphasis added).

■ Although the Policy Guidance had not been published when the Town proposed the IEP at issue in this case, the Town took many, if not all, of the Policy Guidance's enumerated "factors to be considered in the development of IEPs" into account. For example, the proposed IEP provides for a cued speech interpreter for Travis at both Yarmouth and Baxter, because that is Travis's and his family's preferred mode of communication. In addition, Travis's linguistic needs and potential for using residual hearing are directly provided for through his placement at Baxter. Language is emphasized throughout the school day at Baxter, thus Travis will get the intensive linguistic focus that he currently requires, (Earl, 8/30/91 Transcript, p. 232), particularly in the subjects with which he struggles.[9] Also, Baxter teachers speak when they teach and wear a microphone so that the students with residu-

9. At the time of her testimony, Ms. Earl had been teaching at Baxter for seven years. She is a teacher of the deaf and teaches speech and language to high school and middle school students. In addition, she works as a public outreach consultant for cued speech students throughout Maine. She attended two or three PET meetings for Travis. (Earl, 8/30/91 Trans., pp. 215–217).

al hearing get the direct signaling from their voices for instruction. *Id.* at 231.

Additionally, Travis will not be the only oral hearing impaired child in the middle school classroom. As of August 1991, he would join two other oral hearing impaired children in a class of seven.[10] *Id.* Further, his time at Baxter will provide him with exposure to deaf culture and peer interaction with other hearing impaired children. Finally, his time at Yarmouth Intermediate School allows him to be mainstreamed with hearing children in an oral setting for classes in which the evidence shows he has less difficulty, such as music, art, physical education, and math. Thus, the proposed IEP clearly considered the factors deemed important by the Department of Education's own Policy Guidance.

This Court agrees with the Hearing Officer's finding that "more intensive instruction geared to [Travis's] level of need is required." Special Education Due Process Hearing Decision, p. 4. The proposed IEP provides such intensive instruction, in both a mainstream and specialized environment. Thus, the proposed IEP, placing Travis half-time in Yarmouth and half-time in Baxter, satisfies the *Rowley* "free appropriate education" test. It appears reasonably calculated to provide educational benefit to Travis as an oral hearing impaired student, and, as such, constitutes a free appropriate education under both the IDEA and Section 504.

### COSTS

■ Plaintiff seeks reimbursement in the amount of $28,380.19 for Travis's tuition and reasonable expenses at the Clarke School for the Deaf for academic year 1991–1992. Pending completion of adversary proceedings, the Act mandates that "unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement." 20 U.S.C. § 1415(e)(3). While the law does not require parents to keep a child in a program they feel is inappropriate, "it operates in such a way that parents who unilaterally change their child's placement during the pendency of the review proceedings, without the consent of State and local school officials, do so at their own financial risk." *School Committee of Burlington v. Department of Education,* 471 U.S. 359, 373–74, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985). Costs are reimbursed if, and to the extent that, the placement the parents preferred is ultimately determined to be appropriate and the IEP is determined to be inappropriate. *See id.* at 370, 105 S.Ct. at 2003; *Doe v. Brookline School Committee,* 722 F.2d 910, 921 (1st Cir.1983). Otherwise, the costs arising out of a unilateral placement do not shift and must be borne by the parents. *Id.*

In the case at bar, Ms. Brougham removed Travis from Yarmouth schools and placed him at Clarke in the fall of 1991, without consent from Yarmouth school officials, and while the appeal of the proposed IEP was pending. Because this Court holds that the proposed IEP constitutes a free appropriate education as defined under the IDEA, the cost of Ms. Brougham's unilateral placement of Travis at the Clarke School must be borne by Ms. Brougham.

Accordingly, it is ORDERED that the Hearing Officer's decision is hereby AFFIRMED and Plaintiff's request for reimbursement of the cost of Travis's placement at Clarke for 1991–1992 is hereby DENIED.

So ORDERED.

---

10. While approximately ten other Baxter students are familiar with cued speech, none uses it as his or her primary form of communication. Earl, 8/30/91 Trans. at 238. The Court notes that this will be the first time at Baxter that a student relies on a teacher who is speaking and signing, and a cued speech transliterator. *Id.* at 254.