### IN THE COURT OF APPEALS OF TENNESSEE, AT NASHVILLE

_____

|  |  |  |
|---|---|---|
| | ) | |
| **THE WILSON COUNTY SCHOOL** | ) | Davidson County Chancery Court |
| **SYSTEM**, | ) | No. 91-2675-II |
| | ) | |
| Plaintiff/Appellee/Cross-Appellant, | ) | |
| | ) | C.A. No. M1999-00359-COA-R3-CV |
| VS. | ) | |
| | ) | |
| **CREAD CLIFTON and wife, TAMELA** | ) | |
| **CLIFTON, as next of kin for their minor** | ) | |
| **son, WILLIAM (KYLE) CLIFTON**, | ) | |
| | ) | |
| Defendants/Appellants/Cross-Appellees. | ) | |
| | ) | |

_____

From the Chancery Court of Davidson County at Nashville.
**Honorable Carol L. McCoy, Chancellor**

**J. Page Garrett**,
Tennessee Protection & Advocacy, Nashville, Tennessee
Attorney for Defendants/Appellants/Cross-Appellees.

**Michael R. Jennings**, Lebanon, Tennessee
Attorney for Plaintiff/Appellee/Cross-Appellant.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Cread and Tamela Clifton, on behalf of their minor son, William Kyle Clifton, appeal the trial court's judgment denying their request for prejudgment interest on a reimbursement award and an attorney's fee award entered in their favor pursuant to the Individuals with Disabilities Education Act. The Wilson County School System also has appealed, contending that the trial court erred (1) in granting the Cliftons' claim for reimbursement, and (2) in awarding the Cliftons' attorney's fees based upon the court's ruling that the Cliftons were the prevailing party in this litigation. After carefully reviewing the record, we affirm the trial court's judgment in its entirety.

### I. *The Individuals with Disabilities Education Act (IDEA)*

The Cliftons brought this action against the Wilson County School System pursuant to the Individuals with Disabilities Education Act (IDEA).[1] Before setting forth the factual and procedural history of this case, we find it useful to outline some of the basic purposes and requirements of the IDEA. In enacting the IDEA, Congress intended, *inter alia*, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C.A. § 1400(d)(1)(A) (West 2000). To this end, the IDEA requires public school districts to develop a curriculum "tailored to the unique needs of the [disabled] child by means of an 'individualized educational program'" (IEP). *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 397-98 (6th Cir. 1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 181-82 (1982)).

An IEP is "the written statement which sets out an educational program to meet the particularized needs of a child with disabilities." *Tennessee Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1471 (6th Cir. 1996). The IEP's "development and implementation . . . are the cornerstones of the [IDEA]." *Id*. Among other things, each IEP must set forth "the child's current abilities, a description of the services to be provided, and progress

---

[1]For the current version of the IDEA, see 20 U.S.C.A. §§ 1400–1487 (West 2000).

goals." ***Wise v. Ohio Dep't of Educ.***, 80 F.3d 177, 183 (6th Cir. 1996) (citing 20 U.S.C.A. § 1401(a)(20)).[2]

The IDEA requires public school districts to ensure that children with disabilities are educated "to the maximum extent appropriate" with nondisabled children. ***Doe v. Board of Educ.***, 9 F.3d 455, 460 (6th Cir. 1993), ***cert. denied***, 511 U.S. 1108 (1994); 20 U.S.C.A. § 1412(a)(5)(A) (West 2000). In this way, Congress has stated a "very strong" preference for "mainstreaming" disabled children by placing them in regular classes where feasible. ***Doe v. Board of Educ.***, 9 F.3d at 460. Nevertheless, this "mainstreaming" requirement is not absolute, and courts have recognized that mainstreaming is not required in every case. ***Id***. Instead, the proper inquiry remains whether the proposed placement is appropriate under the IDEA. ***Id***.

Under the IDEA, parents who complain about the adequacy of their child's IEP may request an impartial due process hearing to be conducted by the local educational agency. ***See*** 20

---

[2]The current version of the IDEA provides that an IEP must contain, ***inter alia***, the following elements:

> (i)  a statement of the child's present levels of educational performance, . . .
>
> (ii)  a statement of measurable annual goals, including benchmarks or short-term objectives, . . .
>
> (iii)  a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . .
>
> (iv)  an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class . . .
>
> . . . .
>
> (vi)  the projected date for the beginning of the services and modifications described in clause (iii), and the anticipated frequency, location, and duration of those services and modifications;
>
> . . . .
>
> (viii)  a statement of –
>
> (I)  how the child's progress toward the annual goals described in clause (ii) will be measured; and
>
> (II)  how the child's parents will be regularly informed . . . of . . . [their child's progress].

20 U.S.C.A. § 1414(d)(1)(A) (West 2000).

U.S.C.A. § 1415(f) (West 2000). If the parents are dissatisfied with the results of the due process hearing, the parents may appeal to the state educational agency, which is required to conduct an impartial review of the local educational agency's decision. *See* 20 U.S.C.A. § 1415(g) (West 2000). After exhausting the state's administrative procedures, the parents may bring a civil action in state court or federal district court. *See* 20 U.S.C.A. § 1415(i)(2) (West 2000).

If the parents ultimately pursue such a civil action, the trial court is required to use a modified *de novo* standard for reviewing the decision of the state educational agency. *Peck v. Lansing Sch. Dist.*, 148 F.3d 619, 625 (6th Cir. 1998); *Doe v. Metropolitan Nashville Pub. Sch.*, 133 F.3d 384, 387 (6th Cir.), *cert. denied*, 119 S. Ct. 47 (1998). This standard requires the trial court to conduct an independent reexamination of the evidence. *Renner v. Board of Educ.*, 185 F.3d 635, 641 (6th Cir. 1999). In conducting its review, however, the trial court must give "due weight" to the state administrative proceedings and, specifically, to the findings and determinations of the hearing officer or the administrative law judge who heard the case. *Peck*, 148 F.3d at 625-36; *Doe v. Metropolitan Nashville Pub. Sch.*, 133 F.3d at 388; *Gillette v. Fairland Bd. of Educ.*, 932 F.2d 551, 553 (6th Cir. 1991). This deference to the final decisions of state authorities is required because "courts are generalists with no expertise in the educational needs of [disabled] children, and will benefit from the factfinding of a state agency with expertise in the field." *Renner*, 185 F.3d at 641 (quoting *Doe v. Smith*, 879 F.2d 1340, 1343 (6th Cir. 1989), *cert. denied*, 493 U.S. 1025 (1990)). Due to their technical expertise, "administrative agencies are traditionally better suited to make these types of determinations." *Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 107 (6th Cir.), *cert. denied*, 506 U.S. 941 (1992).

In construing the IDEA's requirement of a free appropriate public education, the federal courts repeatedly have emphasized that public schools are not required to maximize a disabled student's educational potential. *Renner v. Board of Educ.*, 185 F.3d 635, 644 (6th Cir. 1999); *Doe v. Board of Educ.*, 9 F.3d 455, 459 (6th Cir. 1993), *cert. denied*, 511 U.S. 1108 (1994); *Cordrey v. Euckert*, 917 F.2d 1460, 1473-74 (6th Cir. 1990), *cert. denied*, 499 U.S. 938 (1991); *Brimmer v. Traverse City Area Pub. Sch.*, 872 F. Supp. 447, 454 (W.D. Mich. 1994). Public schools need only (1) comply with the IDEA's procedural requirements, and (2) develop an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Renner*, 185 F.3d at

644; *Babb*, 965 F.2d at 107; *Cordrey*, 917 F.2d at 1464. In this regard, the IDEA requires only that public schools "provide children with disabilities an appropriate education, not the very best possible special education services." *Wise v. Ohio Dep't of Educ.*, 80 F.3d 177, 185 (6th Cir. 1996); *accord Cordrey*, 917 F.2d at 1474. The IDEA "provides no more than a 'basic floor of opportunity.'" *Doe v. Board of Educ.*, 9 F.3d at 459 (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 201 (1982)); *see also Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (noting that IEP need not maximize child's potential, offer superior opportunities, or provide optimal level of services).

Nevertheless, in order to be "appropriate," the educational benefits provided by the school district must be more than *de minimis*. *Doe v. Board of Educ.*, 9 F.3d at 459. The "basic floor of opportunity" provided by the IDEA should consist of "access to specialized instruction and related services which are individually designed" to "confer some educational benefit" upon the disabled child. *Rowley*, 458 U.S. at 201. Thus, the IEP proposed by the school district should provide an opportunity for "meaningful" and not merely "trivial" advancement. *Walczak*, 142 F.3d at 130; *see also Bonnie Ann F. v. Calallen Indep. Sch. Dist.*, 835 F. Supp. 340, 346 (S.D. Tex. 1993) (indicating that, although IDEA does not require school district to attempt to maximize each child's potential, educational benefit provided to child must be "meaningful"), *aff'd*, 40 F.3d 386 (5th Cir. 1994), *cert. denied*, 514 U.S. 1084 (1995).

If the parents unilaterally place their child in a private program pending the outcome of the administrative and judicial review process, the parents may seek retroactive reimbursement for educational expenses and related services under the IDEA. *Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 107 (6th Cir.), *cert. denied*, 506 U.S. 941 (1992) (citing *School Comm. v. Massachusetts Dep't of Educ.*, 471 U.S. 359, 369 (1985)). In such a case, however, the parents have the burden of proving by a preponderance of the evidence that the proposed IEP was "inadequate," "inappropriate," or "improper" and, further, that the private school placement was "proper" or "appropriate." *Renner v. Board of Educ.*, 185 F.3d 635, 642 (6th Cir. 1999); *Doe v. Metropolitan Nashville Pub. Sch.*, 133 F.3d 384, 387 (6th Cir.), *cert. denied*, 119 S. Ct. 47 (1998); *Wise v. Ohio Dep't of Educ.*, 80 F.3d 177, 184 (6th Cir. 1996); *Doe v. Board of Educ.*, 9 F.3d 455, 458 (6th Cir. 1993), *cert. denied*, 511 U.S. 1108 (1994); *Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 108 (6th Cir.), *cert.*

*denied*, 506 U.S. 941 (1992); *Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990). In accordance with the foregoing authorities, the parents do not meet this burden merely by proving that the private facility provided their child with superior services. *Doe v. Board of Educ.*, 9 F.3d at 459. Rather, the parents first must prove that the public school was "unable to provide [their] child with an appropriate education." *Gillette v. Fairland Bd. of Educ.*, 932 F.2d 551, 554 (6th Cir. 1991).

## II. Factual and Procedural History of the Cliftons' IDEA Claim

The present dispute focuses on the Wilson County School System's efforts to develop an appropriate IEP for the Cliftons' son, Kyle. Prior to his second birthday, Kyle was diagnosed as having a bilateral hearing impairment, and he was fitted for a hearing aid. As a result of his hearing impairment, Kyle's development of receptive and expressive language was delayed. For purposes of these proceedings, the parties did not dispute that Kyle had a disability and that he was entitled to special education services in accordance with the IDEA. The parties also did not dispute that Kyle became eligible to receive these services when he reached the age of four years on March 23, 1990.[3]

Prior to Kyle's fourth birthday, Kyle's mother, Tamela Clifton, contacted the Wilson County School System to inquire about providing special education services for Kyle. In response to this request, the School System assembled an initial M-Team[4] meeting for Kyle in February 1990. At this meeting, School System representatives learned that Kyle also suffered from dyspraxia and that this condition might have further delayed his speech and language development. The condition had been tentatively diagnosed by the staff of the Bill Wilkerson Hearing and Speech Center in Nashville, where Kyle was a student, and the diagnosis later was confirmed by Dr. Russell Jack Love, a speech and language pathologist. Dr. Love explained that dyspraxia was a movement disorder and that, more specifically, dyspraxia of speech was an inability to plan and sequence the

---

[3]*See* Tenn. Code Ann. § 49-10-102(1) (1990).

[4]An M-Team consists of "a group of individuals, including educators and medical professionals with knowledge of a child's condition, who are required to develop an Individualized Educational Program or IEP . . . , specifying the necessary special education and related services which the child needs in order to receive a free appropriate public education." *Tennessee Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1471 (6th Cir. 1996) (citing 34 C.F.R. §§ 300.340–350).

movements of speech. The Bill Wilkerson Center's staff first suspected that Kyle had this condition when they observed that he did not move his mouth when he spoke.

The M-Team met on at least two subsequent occasions, once in March 1990 and again in May 1990. During this process, School System employees attempted to address concerns raised by the Cliftons and, at each meeting, they proposed an IEP that they hoped would assuage the Cliftons' concerns. Despite these efforts, at the conclusion of each meeting, the Cliftons rejected the proposed IEP as unacceptable, and they ultimately requested a due process hearing in accordance with the IDEA. Pending the administrative proceedings that followed, Kyle remained a student at the Bill Wilkerson Center. Consequently, in addition to challenging the School System's final IEP, the Cliftons sought reimbursement for the expense of educating Kyle at the Bill Wilkerson Center.

The final IEP proposed by the School System in May 1990 is the subject of this dispute. In this IEP, the School System offered Kyle the following special education services:

1. Placement in special education classroom taught by Beverly Mainland three days per week, six hours per day;

2. Use of FM auditory trainer[5] at school;

3. Classroom assistance of deaf educator Chris Refseth thirty minutes per week;

4. Speech and language therapy provided by Jane Ann Elrod three days per week, thirty minutes per day;

5. Audiology evaluation three times per year; and

6. Occupational therapy evaluation.

In July 1990, Michael Dover, the School System's Director of Special Education Services, wrote a letter to the Cliftons in which he summarized the School System's May 1990 IEP. In addition to describing the foregoing services, Dover indicated that the School System would "also take [deaf educator Chris Refseth's] advice regarding physical changes in the classroom environment needed to enhance Kyle's ability to learn and [would] make those modifications immediately upon

---

[5]The evidence indicated that an FM auditory trainer was a system worn by Kyle and his teacher that overrode other noises in the room when the teacher spoke.

her recommendation." Although the Cliftons previously had voiced specific objections about certain physical characteristics of the classroom proposed for Kyle, Dover's letter did not indicate what physical changes Refseth had advised or what modifications the School System proposed to make.

At the hearing before the administrative law judge (ALJ),[6] Mrs. Clifton explained some of the reasons the Cliftons rejected the final IEP proposed by the School System for Kyle. After describing the classroom proposed for Kyle, Mrs. Clifton explained her objections to the room's acoustic conditions:

> What I observed about the classroom first on initial impact, was the size of the room. It was very big. It had very large ceilings. There was no carpet, there [were] no curtains on the windows. . . .
>
> . . . .
>
> Well, the reason that there is a problem with a large room and high ceilings is because acoustically that's not correct for hearing impaired children. On parents' terms and mother's terms, Kyle does not hear as well in a large room. There is more room for noises. Carpet is always applied in hearing impaired children's rooms because it just keeps the sound – just makes it louder for them. It makes the [teacher's] voice – it makes – it just sort of closes in the room, and so it really helped them talk. There was also an air conditioning unit that was going on and off during this time because Kyle has – or heating unit – I'm not sure which. Because Kyle has normal hearing in the low frequency, normal to a mild loss, he's very sensitive to a low frequency sound. So everytime that furnace came on, Kyle said, I hear it, I hear it. And I have talked to Wilson County about this matter. They said while Kyle was in the classroom they would just turn the furnace off so he wouldn't have that problem.

Mrs. Clifton also complained that the classroom's visually stimulating appearance and the teacher's instructional methods were designed for special education children and not hearing-impaired children. In addition to expressing concern over the teacher's lack of experience with hearing-impaired children, Mrs. Clifton explained:

> But the other thing is because it was very visually stimulating. When you work with hearing impaired children, you do not try to visually stimulate them. They don't need to have – for the most part, and for Kyle, the individual we're talking about, he doesn't have

---

[6]The September 1990 due process hearing did not result in a decision because the ALJ presiding over the hearing subsequently recused himself. The Commissioner of the Tennessee Department of Education assigned the case to another ALJ, who conducted a hearing on the merits in April 1991.

emotional or lack of environmental needs, that he [doesn't] see things, so he doesn't need to be visually stimulated. How they [the Bill Wilkerson Center's staff] work with him mostly is to develop his auditory skills. They put their hands over their mouth when they talk to him to make sure he's listening, and not so he can look at all these things.

. . . .

. . . And I had some problems with the way the class was taught because it was visually stimulating, and because it was designed for these children and not for a hearing impaired child, the language – the part of language was only a minor part of their class. They'd had A-B-C time, they had language time, they had math time, they had this time, and they had that time, so language was only a small part, whereas, with a hearing impaired child, they need to just have all the speech and language that they can possibly have.

The Cliftons' objections were supported by several educators who testified on the Cliftons' behalf. Mary Ann Schaffer, the director of the Bill Wilkerson Center's early intervention program, had a master's degree in speech and language pathology. Schaffer described observations that she made of the proposed classroom during a May 1990 visit:

The classroom was very large and very noisy. There was an air conditioning unit that ran continuously during the time that I was in the classroom, and every once in a while it would kind of kick in and become even louder. And the classroom was not carpeted, the room echoed, there were very high open ceilings, there were a lot of windows without drapes, and it was a very stimulating classroom.

Schaffer explained why these physical characteristics presented problems for a hearing-impaired child like Kyle:

One of the necessities for educating a hearing impaired child is that we look at their deficit, which is that they have difficulty hearing, and if you put them in an environment where it makes it almost impossible for them to hear, you're not going to get a lot of input into the child. So one of the first things that we look for in serving a hearing impaired child is that they be in an acoustically comfortable environment. And there are a lot of things that can be done to a classroom, like using drapes, carpeting, corkboard, things like that, that will absorb the sound.

In addition to the foregoing concerns, Schaffer opined that the proposed classroom setting was inappropriate for Kyle for another reason. The teacher of the comprehensive development

classroom, Beverly Mainland, was a special education teacher, but she was not trained to work with hearing-impaired children.

Similar concerns were expressed by Tracy Jo Duncan Burkhardt, the regional coordinator for the Tennessee Infant Parent Program. Burkhardt, who had a master's degree in deaf education, testified that the comprehensive development classroom in which the School System proposed to place Kyle "was an exceptional classroom as far as [she] was concerned in terms of what it offer[ed] for comprehensive developmental delays." Burkhardt did not believe, however, that the classroom was appropriate for a hearing-impaired child. Burkhardt pointed out that the classroom teacher's expertise was in special education. Burkhardt also explained that the classroom's language curriculum, which was designed for special education children rather than for hearing-impaired children, was not appropriate for Kyle:

> I felt like the language approach that they were using should be completely redirected in terms of Kyle, that they needed to use a different type of approach, and I recommended some approaches in terms of a language curriculum that would be more appropriate for a hearing impaired child.

The Cliftons also called Beverly Mainland, the teacher of the comprehensive development classroom, as a witness. Mainland testified that she had a bachelor's degree in elementary education, with a concentration in special education. During her ten-year teaching career, Mainland had taught several hearing-impaired children, but she was not certified in deaf education or speech and language pathology. Mainland had no experience teaching dyspraxic children, and any familiarity that she had with dyspraxia was developed through her contact with the Cliftons. Mainland was not familiar with any particular instructional methods or approaches that should be used when teaching dyspraxic children. Mainland provided the following physical description of her classroom:

> The ceilings are high, the walls – my room is basically the same as it was [in May 1990]. We had added – I have a carpet in the toy corner. I have a central air unit, but that can be cut off and on at our discretion. We have a lot of things on the wall, colorful things and stimulating things.

In defending its May 1990 IEP, the School System presented the testimony of, *inter alia*, Lynn Sewell, an educational specialist who worked for the School System's special education department, and Chris Refseth (now Chris Lewis), the School System's deaf education teacher. Lynn Sewell testified that, by the time the second M-Team meeting took place in March 1990, the School System was aware of the classroom's acoustical problems and the need to make modifications:

> There was a lot of discussion at this M-Team and prior to this M-Team, observations of the classroom, so we had been informed of the acoustics and how that might affect Kyle. And at this M-Team, one of the responsibilities that we had was also to address that concern. Our recommendation was ultimately that one time a week our person that's in charge of deaf education, Chris Refseth, that she meet with – she meet with the teacher, with the speech and language therapist and observe Kyle. But one of her responsibilities and one of the goals that was written at the M-Team was for Chris to tell us what we needed to do to acoustically treat the room, because it does have very high ceilings, and the air conditioner made more noise, and this room is – this room also, we had been told that it was visually very distracting, and we understood that, because this room is very highly decorated. So at this M-Team we were aware of the need to acoustically attend to the room, and Chris had experience and had some training in those areas, so she was the person that we recommended advise us.

Although Sewell's testimony demonstrated that the School System was aware of specific problems with the classroom's acoustics and appearance as early as March 1990, neither the School System's March 1990 IEP nor its May 1990 IEP proposed specific modifications to the classroom. Sewell testified that such modifications were included as a "goal" on both the March 1990 IEP and the May 1990 IEP, but she acknowledged that the School System provided no specifics as to how these problems would be remedied. Sewell first defended this failure to provide specifics on the fact that, at the March 1990 M-Team meeting, Chris Refseth had not yet visited Beverly Mainland's classroom. Sewell later defended the School System's failure to make specific proposals on the fact that the School System had "not yet had permission to serve Kyle, so there [had] been no implementation of any of the goals written, so there would have been no changes." When Chris Refseth testified, she indicated that she was qualified and willing to make recommendations to the School System concerning any necessary classroom modifications. The School System presented no testimony, however, as to any specific modifications that Refseth had recommended or that the

School System had agreed to implement to make the classroom a more appropriate instructional setting for Kyle.

On June 17, 1991, the ALJ entered a final order that granted prospective injunctive relief in that it directed the School System to make available an IEP containing the components outlined in the ALJ's order, the School System's proposed May 1990 IEP, and the School System's correspondence and representations to the Cliftons. In this regard, the ALJ's final order directed the School System to "provide the necessary related services, including but not limited to, modification of the facilities to create an acoustically treated environment" and, further, to "provide qualified professionals to 'appropriately' address [Kyle's] hearing, speech, and language impairments."

In addition to directing the School System to develop an appropriate IEP, the ALJ's final order granted the Cliftons' claim for reimbursement for the expense of educating Kyle at the Bill Wilkerson Center from March 23, 1990, Kyle's fourth birthday, until June 17, 1991, the date of the ALJ's order. Despite the Cliftons' success on their reimbursement claim, the ALJ declared the School System to be the prevailing party in this action. The ALJ supported this ruling by reasoning that "present placement," rather than reimbursement, was "the issue of paramount concern" in this litigation.

As permitted by the IDEA, the School System sought review of the ALJ's final order by filing a petition in the trial court. The record indicates that the trial court affirmed the ALJ's decision by a judgment entered on October 2, 1992; however, the October 1992 judgment does not appear in the record. The School System then appealed the trial court's judgment to this court.

The first time this case was appealed, this court remanded it for further proceedings because the October 1992 judgment was not a final judgment. *See* Tenn. R. App. P. 3(a). In April 1994, the trial court entered a final judgment, and this case again was appealed. On the second appeal to this court, rather than deciding the case on the merits, this court vacated the trial court's judgment and remanded the case for the ALJ to supplement his final order with additional findings of fact and conclusions of law in accordance with Tennessee Code Annotated section 27-3-128

(1980).[7] *Wilson County Sch. Sys. v. Clifton*, No. 01A01-9604-CH-00152, 1996 WL 656109, at \*5 (Tenn. Ct. App. Nov. 13, 1996) (*no perm. app. filed*). In November 1997, the ALJ entered a revised final order that attempted to address some of the concerns expressed in this court's opinion.

Upon review of the ALJ's revised final order, the trial court ruled that the preponderance of the evidence supported the ALJ's findings that the School System's IEP was inappropriate and that the Bill Wilkerson Center placement was appropriate. Accordingly, the trial court upheld the ALJ's decision to grant the Cliftons' claim for reimbursement in the amount of $12,058.32. On the other hand, the trial court did not uphold the ALJ's finding that the School System was the prevailing party. The court reasoned that the Cliftons prevailed on a significant issue in this litigation when the ALJ granted their claim for reimbursement. In a subsequent order, the trial court awarded attorney's fees to the Cliftons' attorneys in the total amount of $18,069.25. The court denied the Cliftons' request for prejudgment interest. Both parties appealed the trial court's judgment, and this appeal is again before this court for review.

### III. The Cliftons' Claim for Reimbursement Under the IDEA

After carefully reviewing the evidence presented at the administrative hearing, we agree with the trial court that the evidence supports the ALJ's findings that the School System's IEP was inappropriate and that the Bill Wilkerson Center placement was appropriate. The Cliftons' witnesses testified to numerous physical problems with the proposed classroom, including the high ceiling, the loud heating and cooling unit, the lack of carpeting, drapery, corkboard, and other sound-absorbing materials, and the plethora of visually stimulating materials. Although the School System claimed to have addressed these problems in its final IEP, notably, the School System's own witnesses acknowledged that the May 1990 IEP failed to propose any specific modifications to the

---

[7]Section 27-3-128 authorizes the appellate court

> in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the objects of the order, and upon such terms as may be deemed right.

Tenn. Code Ann. § 27-3-128 (1980).

classroom.[8]  The only concrete suggestion made by the School System was that the teacher could turn off the heating and cooling unit while Kyle was in the classroom.  The School System did not indicate how it proposed to control the classroom's climate if the heating and cooling unit was turned off during the six hours per day that Kyle was scheduled to be in the classroom.

In addition to attesting to the classroom's physical deficiencies, the Cliftons' witnesses testified that the classroom's curriculum and instructional methods were inappropriate for Kyle.  Beverly Mainland's comprehensive development classroom offered a general curriculum for special education students.  The classroom's curriculum was not designed for hearing-impaired or dyspraxic children, and it did not emphasize the speech and language instruction needed by Kyle.  Moreover, Mainland had not received formal training or certification in the areas of deaf education or speech and language pathology.

In our view, the deficiencies attested to in the present case are similar to those observed in *T.H. v. Board of Education*, 55 F. Supp. 2d 830, 838-43 (N.D. Ill.), *appeal dismissed*, 202 F.3d 275 (7th Cir. 1999).  In that case, T.H. was diagnosed as having autism.  *T.H.*, 55 F. Supp. 2d at 836.  At the administrative hearing, the evidence showed that T.H. had "the capacity to acquire new skills when the educational environment [was] free from distractions and when there [was] continuous intervention by an adult trained to focus [T.H.'s] attention on an appropriate exercise." *Id*. at 837-38.  The school district proposed placing T.H. in a cross-categorical classroom four mornings per week for sessions lasting two and one-half hours each. *Id*. at 839.

---

[8]In this regard, we note that Tennessee's own special education statutes provided that

> [p]hysical aspects and specifications of schools, classrooms and other facilities for, or likely to be used by, [children with disabilities], shall be related to their special physical, educational and psychological needs.  To this end, school districts, special education services associations, agencies of the state and its subdivisions, and any private persons or entities constructing, renovating or repairing facilities with or aided by public funds, which facilities are expressly intended for or are likely to be used by [children with disabilities], shall plan, locate, design, construct, equip and maintain them with due regard for the special capabilities, [disabilities] and requirements of the [children with disabilities] to be accommodated therein.

Tenn. Code Ann. § 49-10-103(f) (1990).

Autism experts who testified at the hearing opined that the cross-categorical classroom was not an appropriate setting for T.H.'s training. *Id*. at 839. One expert, Dr. Luce, testified that early training for children with autism should take place in a setting where distractions were minimized. *Id*. T.H.'s mother testified that T.H. was bothered by singing and loud noises, and she was convinced "that the highly stimulating classroom setting would make it difficult for [T.H.] to learn." *Id*.

The early childhood program in which the school district proposed placing T.H. was not specifically designed to meet the needs of autistic children. *Id*. at 838. Another expert, Dr. Lorber, visited the school district's early childhood classrooms. *Id*. During his visits, Dr. Lorber observed "that the teachers could not describe or easily discuss their approach to teaching autistic children." *Id*. In fact, the school district "did not present a single early childhood teacher with significant training in the education of autistic children." *Id*. at 838 n.9.

Yet another expert, Dr. Leventhal, testified that T.H. needed "a fairly high student/teacher ratio and . . . a lot of complex and coordinated intervention between language and communication people, behavioral management people as well as social skills development folks." *Id*. at 839. In Dr. Leventhal's opinion, the placement proposed by the school district lacked sufficient individual programming and structure to benefit T.H. *Id*. at 840.

In the present case, the evidence showed that Kyle needed the benefits of an acoustically-treated classroom containing minimal visual distractions. Instead, the School System proposed placing Kyle in a special education classroom that the School System's own witnesses acknowledged was not acoustically-treated, was equipped with an intermittently noisy heating and cooling unit, and was highly decorated.

Educators who testified on behalf of the Cliftons at the hearing opined that the proposed classroom setting was not appropriate for Kyle. In addition to the noise and visual distractions, these educators observed that the instructional methods employed in the classroom were designed for special education students, but not for hearing-impaired students. Whereas the

comprehensive development classroom offered a multi-subject curriculum, Kyle needed a curriculum that consistently emphasized and reinforced his speech and language development.

Moreover, the classroom teacher, Beverly Mainland, had limited experience teaching hearing-impaired children, and she was not certified in deaf education or speech and language pathology. Mainland candidly admitted that she had no experience teaching dyspraxic children and that she was unfamiliar with instructional methods used to teach children with dyspraxia. In contrast, the evidence showed that none of these problems existed at the Bill Wilkerson Center and that Kyle's placement there was appropriate.[9]

By way of comparison, we note that the IEP approved in *Brougham v. Town of Yarmouth*, 823 F. Supp. 9 (D. Me. 1993), contained many of the elements that the witnesses testified were lacking in this case. In that case, the evidence showed that Travis, a thirteen-year-old deaf student, had been delayed by as much as four or five years in his speech and language development due to his hearing impairment. *Brougham*, 823 F. Supp. at 11. The IEP proposed by the school system included placement in a classroom of seven children, two of whom also had hearing impairments. *Id*. at 18. The classroom teacher was a teacher of the deaf who taught speech and language to high school and middle school students. *Id*. at 18 n.9. The teacher's instructional methods emphasized language development so that Travis would receive "the intensive linguistic focus" that he required. *Id*. at 17. After considering these elements, the court concluded that the proposed IEP satisfied the IDEA's requirement of providing a free appropriate education to Travis. *Id*. at 18.[10]

---

[9]Although the evidence supported the Cliftons' claim that the School System's May 1990 IEP was inappropriate for Kyle, we reject the Cliftons' contention that the IEP was inadequate because it lacked "any intermediate objective goal sheets for charting the child's progress." In evaluating this type of alleged procedural deficiency, courts have adopted a harmless error analysis. *See Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 399 (6th Cir. 1998); *Doe v. Defendant I*, 898 F.2d 1186, 1190-91 (6th Cir. 1990); *Moubry v. Independent Sch. Dist. 696*, 9 F. Supp. 2d 1086, 1102-04 (D. Minn. 1998); *Logue v. Shawnee Mission Pub. Sch. Unified Sch. Dist. No. 512*, 959 F. Supp. 1338, 1349 (D. Kan. 1997), *aff'd*, 153 F.3d 727 (10th Cir. 1998). Here, the Cliftons' brief fails to explain how they were prejudiced by the IEP's failure to include "intermediate objective goal sheets."

[10]In its decision, the court cited a 1992 policy guidance of the United States Department of Education, which suggested that public school systems have not adequately considered "the unique communication and related needs" of many deaf children in developing IEP's for them. *Brougham*, 823 F. Supp. at 17 (quoting *Deaf Students Education Services Policy Guidance*, 57 Fed. Reg. 49,274 (1992)).

Similarly, in ***Bonnie Ann F. v. Calallen Independent School District***, 835 F. Supp. 340, 347 (S.D. Tex. 1993), ***aff'd***, 40 F.3d 386 (5th Cir. 1994), ***cert. denied***, 514 U.S. 1084 (1995), a case involving a three-year-old hearing-impaired child, the court approved a placement that contained the following components. Along with five other hearing-impaired children, Bonnie attended Regional Day School for the Deaf classes at a public elementary school. ***Bonnie Ann F.***, 835 F. Supp. at 343. The classroom teacher held certificates in speech pathology, speech and hearing therapy, and deaf education. ***Id***. The major elements of Bonnie's educational program were

> language development, speech development, auditory training, preschool readiness activities, and motor development.
>
> . . . [The teacher] provided Bonnie with individual auditory training and speech therapy for a short period of time during the school day. She then reinforced and integrated these lessons throughout the day. Language development training was incorporated in daily class activities.

***Id***. This classroom speech and language training was supplemented with the services of one of the school district's speech therapists, who provided Bonnie with individual speech and language therapy for forty-five minutes per week. ***Id***. After reviewing these components, the court held that "the IEP developed for Bonnie through the IDEA's procedures was reasonably calculated to enable her to receive educational benefits." ***Id***. at 347.

On appeal, the School System insists that, contrary to the ALJ's explicit findings as to the impropriety of the May 1990 IEP, the ALJ implicitly must have found the IEP to be appropriate because he ordered the School System to implement a new IEP that contained the same components. We disagree. The ALJ's final order did not merely order the School System to implement an IEP containing the same components as its May 1990 IEP. The ALJ also ordered the School System to include in its IEP the components outlined in the ALJ's final order. Specifically, the ALJ ordered the School System to "provide the necessary related services, including but not limited to, modification of the facilities to create an acoustically treated environment" and, further, to "provide qualified professionals to 'appropriately' address [Kyle's] hearing, speech, and language impairments." Inasmuch as these components related directly to the deficiencies in the May 1990 IEP identified by the Cliftons' witnesses, we conclude that the ALJ's order required the School

System to provide important services that exceeded the level of services proposed by the School System.[11]

## IV.  The Cliftons' Request for Attorney's Fees Under the IDEA

In light of our affirmance of the trial court's judgment ordering the School System to reimburse the Cliftons the sum of $12,058.32 for Kyle's education at the Bill Wilkerson Center from March 1990 to June 1991, we likewise affirm the trial court's decision to award the Cliftons' attorney's fees incurred in pursuing this action.  The IDEA authorizes the trial court, in its discretion, to award reasonable attorney's fees to the parents of a disabled child when they are the prevailing party in an IDEA action.  *See* 20 U.S.C.A. § 1415(i)(3)(B) (West 2000).  To be a "prevailing party" under the IDEA, the parents must succeed on at least one significant issue in the litigation, and they must obtain at least some relief on the merits of their claim.  *Payne v. Board of Educ.*, 88 F.3d 392, 397 (6th Cir. 1996); *Phelan v. Bell*, 8 F.3d 369, 373 (6th Cir. 1993).  One way to demonstrate such success is by obtaining an enforceable judgment against the school district.  *Payne*, 88 F.3d at 397.  Thus, the trial court, in its discretion, may award attorney's fees to parents who prevail on a claim for reimbursement under the IDEA.  *See, e.g.*, *M.C. v. Voluntown Bd. of Educ.*, 56 F. Supp. 2d 243, 260 (D. Conn. 1999); *Gonzalez v. Puerto Rico Dep't of Educ.*, 969 F. Supp. 801, 815 (D.P.R. 1997); *Doolittle v. Meridian Joint Sch. Dist. No. 2*, 919 P.2d 334, 343 (Idaho 1996).

In the present case, the primary issue before the ALJ and the trial court was the propriety of the IEP proposed for Kyle by the School System.  In order to prevail on their claim for reimbursement, the Cliftons had the burden of proving by a preponderance of the evidence that the proposed IEP was "inadequate," "inappropriate," or "improper" and, further, that Kyle's placement at the Bill Wilkerson Center was "proper" or "appropriate."  *Renner v. Board of Educ.*, 185 F.3d 635, 642 (6th Cir. 1999); *Doe v. Metropolitan Nashville Pub. Sch.*, 133 F.3d 384, 387 (6th Cir.),

---

[11]At the administrative hearing, the evidence indicated that, at the beginning of the 1990-91 school year, a more appropriate classroom placement developed when the School System added a third early intervention classroom to its curriculum.  This class was taught by Dorothy Swan, who had a dual endorsement from the state of Tennessee in both special education and speech and language pathology.  The classroom was in a new school building, and its acoustic design was more appropriate for hearing-impaired children than the classroom proposed in the May 1990 IEP.  In fact, one of the students enrolled in the class was hearing-impaired.  The evidence was undisputed, however, that the School System never offered the Cliftons an IEP proposing this placement for Kyle.

*cert. denied*, 119 S. Ct. 47 (1998); *Wise v. Ohio Dep't of Educ.*, 80 F.3d 177, 184 (6th Cir. 1996); *Doe v. Board of Educ.*, 9 F.3d 455, 458 (6th Cir. 1993), *cert. denied*, 511 U.S. 1108 (1994); *Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 108 (6th Cir.), *cert. denied*, 506 U.S. 941 (1992); *Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990). The Cliftons met this burden and, consequently, obtained a judgment ordering the School System to reimburse them for Kyle's past educational expenses at the Bill Wilkerson Center. Under these circumstances, we agree with the trial court's ruling that the Cliftons were the prevailing party, and we hold that the trial court did not abuse its discretion in awarding the Cliftons' attorney's fees incurred in pursuing this action.

We also affirm the trial court's decision as to the amount of attorney's fees to be awarded. Like the trial court's decision to award attorney's fees, the determination of the amount of attorney's fees to be awarded is largely within the discretion of the trial court. *Chaille v. Warren*, 635 S.W.2d 700, 703 (Tenn. Ct. App. 1982); *Preston Lincoln-Mercury, Inc. v. Kilgore*, 525 S.W.2d 155, 158 (Tenn. Ct. App. 1974). In the court below, the School System raised specific objections to some of the hours claimed by the Cliftons' attorneys in their affidavits submitted in support of the Cliftons' request for attorney's fees. The trial court's final judgment awarding the Cliftons' attorney's fees indicated that the court properly considered each of these objections but that, ultimately, the court found the claimed hours to be reasonable.

On appeal, the School System again contends that the hours claimed by the Cliftons' attorney's were excessive. Our review of this issue is hampered, however, by the fact that the record on appeal contains neither a transcript of the hearing on the Cliftons' request for attorney's fees nor the affidavits submitted by the Cliftons' attorneys in support of their fee request. Pursuant to the Tennessee Rules of Appellate Procedure, the appellant bears the burden of preparing "a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b); *see also Johnson v. Hardin*, 926 S.W.2d 236, 239 (Tenn. 1996); *Nickas v. Capadalis*, 954 S.W.2d 735, 742 (Tenn. Ct. App. 1997). In the absence of the attorney's affidavits or any other evidence on this issue, we are unable to conclude that the trial court abused its discretion in awarding the Cliftons' attorney's fees in the full amount requested.

### V. The Cliftons' Request for Prejudgment Interest

Having affirmed the trial court's awards for reimbursement and attorney's fees, we now turn to the final issue raised in this appeal: whether the trial court erred in denying the Cliftons' request for prejudgment interest on both the reimbursement award and the attorney's fee award. As a general rule, a claimant's entitlement to prejudgment interest under a federal statute is a question of federal law. *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 224 (1st Cir. 1996); *United States ex rel. Bartec Indus., Inc. v. United Pac. Co.*, 976 F.2d 1274, 1279 (9th Cir. 1992), *amended on other grounds*, 15 F.3d 855 (9th Cir. 1994); *United States ex rel. Georgia Elec. Supply Co. v. United States Fidelity & Guar. Co.*, 656 F.2d 993, 997 (5th Cir. 1981); *United States ex rel. Balf Co. v. Casle Corp.*, 895 F. Supp. 420, 429 (D. Conn. 1995). If the federal statute is silent on the issue, however, courts may look to state law for guidance. *Cottrill*, 100 F.3d at 224-25; *United Pac.*, 976 F.2d at 1279; *USF&G*, 656 F.2d at 997; *Casle Corp.*, 895 F. Supp. at 429.

Under Tennessee law, trial courts are authorized to award prejudgment interest as an element of damages "in accordance with the principles of equity." Tenn. Code Ann. § 47-14-123 (1995).[12] In *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998), our supreme court explained that an award of prejudgment interest under this statute

> is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. . . . This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found.

*Myint*, 970 S.W.2d at 927 (citations omitted).

---

[12]The parties have not raised, and we do not decide, the issue of when postjudgment interest began to accrue in this case. *See* Tenn. Code Ann. § 47-14-122 (1995) (providing that "[i]nterest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial").

In addition to clarifying the standard to be applied in prejudgment interest cases, the supreme court set forth several principles to guide trial courts in exercising their discretion to award or deny prejudgment interest:

> Foremost are the principles of equity. . . . Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. . . .

> In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. . . . The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds.

*Id*. (citations omitted).

In accordance with these principles, we conclude that the trial court did not abuse its discretion in denying the Cliftons' request for prejudgment interest. The Cliftons convincingly argue that they have been unfairly denied the use of a substantial sum of money throughout the nine-year history of this litigation. The Cliftons' loss of use of these funds, however, was merely one of the factors that the trial court was required to consider in deciding the Cliftons' request for prejudgment interest. Following the *Myint* decision, the appellate courts of this state have recognized that a trial court does not abuse its discretion in denying a claim for prejudgment interest where the defendant reasonably disputes either the amount of the obligation or the existence of the obligation itself. *See, e.g.*, *Alexander v. Inman*, 974 S.W.2d 689, 698 (Tenn. 1998); *Brandt v. BIB Enters., Ltd.*, 986 S.W.2d 586, 595 (Tenn. Ct. App. 1998); *see also Newton v. Cox*, 954 S.W.2d 746, 748-49 (Tenn. Ct. App. 1997).

The record in the present case reveals that, although ultimately unsuccessful, the School System reasonably disputed the existence of its obligation to reimburse the Cliftons for Kyle's placement at the Bill Wilkerson Center and, concomitantly, its obligation to pay the Cliftons' attorney's fees. Despite this court's affirmance of the trial court's judgment ordering the School

System to reimburse the Cliftons, we believe that the evidence at the administrative hearing presented a close question as to whether the School System's proposed IEP was appropriate for Kyle. This belief has been reinforced by an extensive review of IDEA case law, during which we were constantly reminded that the IDEA provides no more than a "basic floor" of educational opportunity for disabled children and that it does not require public school districts to provide the "best" possible program. *Board of Educ. v. Rowley*, 458 U.S. 176, 201 (1982); *Wise v. Ohio Dep't of Educ.*, 80 F.3d 177, 185 (6th Cir. 1996); *Doe v. Board of Educ.*, 9 F.3d 455, 459 (6th Cir. 1993), *cert. denied*, 511 U.S. 1108 (1994); *Cordrey v. Euckert*, 917 F.2d 1460, 1473-74 (6th Cir. 1990), *cert. denied*, 499 U.S. 938 (1991). Under the circumstances of this case, we conclude that the School System reasonably disputed its obligations to the Cliftons under the IDEA, and we decline to disturb the trial court's decision to deny the Cliftons' request for prejudgment interest.[13]

The trial court's judgment is affirmed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the Wilson County School System, for which execution may issue if necessary.

_____

FARMER, J.

_____

CRAWFORD, P.J., W.S.

_____

HIGHERS, J.

---

[13]The record also reveals that the School System reasonably disputed the amount of attorney's fees to be awarded. In its final judgment, the trial court implicitly, if not explicitly, acknowledged the reasonableness of the School System's objections to the amount of fees requested when the court observed that the objections "focuse[d] on entries that border[ed] on excessive time." Despite these objections, the trial court found the fees requested "to be within the range of reasonableness," and it awarded the Cliftons' attorneys the full amount requested.

This case illustrates why, in our view, the award of prejudgment interest on attorney's fees is problematic. As in the present case, the reasonableness of the attorney's fees to be awarded often is disputed, and the amount of the award is not established with certainty until entry of the final judgment. Even in cases where the amount is not disputed, attorney's fees may be gradually incurred over an extended period of time. In the present case, for example, the Cliftons' attorney's fees were incurred over a nine-year period. In such cases, the problem arises as to when prejudgment interest would begin to accrue.