IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 10, 2004 Session

## MICHAELA BABB v. HAMILTON COUNTY BOARD OF EDUCATION

**Appeal from the Circuit Court for Hamilton County**
**No. 03C1151      W. Neil Thomas, III, Judge**

 **Filed September 21, 2004** 

**No. E2004-00782-COA-R3-CV**

———————————————

This is a suit brought by a school teacher against the Hamilton County Board of Education under the Tennessee Governmental Tort Liability Act wherein the teacher alleges neglignce on the part of the Board of Education as a result of an assault on her by a student who was re-enrolled in school and re-placed in her classroom despite the fact the student had assaulted her the previous month and been suspended from school. The trial court granted the Board of Education's motion for summary judgment.  We hold that the decision to place the student back in the teacher's classroom, despite the previous assault, was a discretionary action for which the Board of Education was immune from liability.  Accordingly, we affirm and remand to the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. and CHARLES D. SUSANO, JR, J., joined.

Jeffrey D. Boehm, Chattanooga, Tennessee, for the Appellant, Michaela Babb

D. Scott Bennett, Chattanooga, Tennessee, for the Appellee, Hamilton County Board of Education

**OPINION**

The Appellant, Michaela Babb, was, at all times relevant to the matters described herein, employed by the Appellee, Hamilton County Board of Education (hereinafter HCBE), as a second grade school teacher at Orchard Knob Elementary School in Hamilton County, Tennessee.  Alex Fields was enrolled as a student in Ms. Babb's class during the 2002-2003 school year. Alex had a history of socially aggressive behavior and, on November 20, 2002, the school psychologist at Orchard Knob issued a psychological evaluation report on him. The report analyzes information provided by an assessment team composed of two school psychologists, two teachers, the school principal, an educational diagnostician, Alex's mother, his guardian *ad litem*, his Department of

Child Services case manager and school principal, Betty Williams. With respect to Alex's educational history, the report shows "[t]eacher concerns included fighting in the classroom, not sitting still, temper control issues, and not doing class work." The report indicates that Alex's mother is also concerned that "Alex can't sit still, often gets into fights, and doesn't mind, especially at school." The report closes with a recommendation statement which includes the following:

> The team should convene and consider all assessments in planning an educational program for this student. Symptoms of ADHD[1] were observed in the classroom and were reported by both the mother and the teacher. However, no medical statement has been completed, and TEAM evaluation did not diagnose ADHD due to inconsistent test results.

On December 9, 2002, less than one month after the issuance of this report, Alex assaulted Ms. Babb in her classroom by striking her in the face. As a consequence of this incident, Alex was suspended from school for ten days by the school principal, Betty Williams. Ms. Williams attests that she had also begun preparations to expel him pursuant to state and local zero-tolerance policies when she was contacted by an official with the Tennessee Department of Human Services who advised her that she could not legally expel Alex if his conduct was a manifestation of a disability. Ms. Williams attests that she thereafter arranged for an Individualized Education Program (hereinafter "IEP") team to review Alex's situation.

The IEP team, which consisted of teachers, the school psychologist, Alex's mother, Ms. Williams and others, met on December 12, 2002. The team's report concludes that Alex "[d]oes not meet the standards for any disabilities" and that he is not eligible for special education for that reason. However, the report also incorporates an "Additional Written Notice" section which indicates a concern that Alex suffers from a "health impairment" and the report concludes with a decision to close the case as to "specific learning disability" and to re-open the case as to "health impairment."

On January 8, 2003, Ms. Williams returned Alex to Ms. Babb's classroom. Unfortunately, on the day of his return to the classroom Alex assaulted both Ms. Babb and a teacher's aide who was assisting Ms. Babb.

On July 3, 2003, Ms. Babb filed a cause of action in the Hamilton County Circuit Court against HCBE [2] for damages under the Tennessee Governmental Tort Liability Act. The complaint alleges that HCBE was negligent in "placing [Alex] back into a regular classroom" and in placing him "back into the classroom of the teacher he had previously assaulted." The complaint further alleges that "[a]s a proximate result of the second assault, Ms. Babb suffered a traumatic brain injury

---

[1] Attention deficit hyperactivity disorder.

[2] The Plaintiff also sued Hamilton County. However, Hamilton County did not file an Answer or any other pleadings and no action was taken by the Plaintiff or the trial court as to this Defendant.

-2-

with seizures, headaches, dizziness, blurred vision, poor memory, emotional liability, hearing loss and dysgraphia."

On September 3, 2003, HCBE filed its motion for summary judgment and supporting memorandum of law in the case asserting its immunity under the Tennessee Governmental Tort Liability Act arguing that Ms. Williams' decision to re-place Alex in Ms. Babb's classroom was a discretionary decision and that HCBE "is immune from suit for the negligent acts of its employees where the employee is acting according to his or her delegated discretion." On September 18, 2003, HCBE filed a reply in further support of its motion for summary judgment asserting that Ms. Williams was prohibited from unilaterally expelling Alex because she had reason to believe that he might qualify for protection under the federal Individuals with Disabilities Education Act (hereinafter "IDEA"). HCBE argued that this law prohibits the expulsion of a student pending a determination as to whether the student's behavior was the manifestation of a disability and requires that the student be kept "in the then-current educational setting" during that period of time. HCBE contended that when Ms. Williams returned Alex to Ms. Babb's classroom she merely exercised her discretion within the restrictions placed upon her under the IDEA.

In response to HCBE's motion for summary judgment, Ms. Babb argued that both state law and local mandates categorize the striking of a teacher as a zero tolerance offense which requires expulsion for one year. Therefore, Ms. Babb contends, Ms. Williams did not have discretion to place Alex back in her classroom and, accordingly, HCBE is liable for her actions.

On March 8, 2004, the trial court entered its memorandum and judgment which sets forth its finding that Ms. Williams' decision was a discretionary decision which involved "balancing the requirements of zero tolerance with the requirements of federal legislation." Based upon this finding, the Court determined that HCBE was immune from suit under the Tennessee Governmental Tort Liability Act. This appeal followed.

The sole issue presented in this appeal is whether Ms. Williams' decision to re-place Alex in Ms. Babb's classroom was an exercise of discretion for which the HCBE is immune from liability under the Tennessee Governmental Tort Liability Act. It is our opinion that the school principal's decision in regards to placing the student back in the classroom was a discretionary function, and therefore, the Defendant is immune from liability under the Tennessee Governmental Tort Liability Act.

Our standard of review is well settled. Summary judgment proceedings are efficient and effective vehicles for concluding cases that can and should be decided on legal issues alone. However, these proceedings should not serve as a substitute for a trial of genuine and material factual matters. *Byrd v. Hall*, 847 S.W.2d 208, 210-211 (Tenn. 1997); *Bellamy v. Federal Express Corp.*, 749 S.W.2d 31, 33 (Tenn. 1988). Summary judgments should be awarded only when the moving party has demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R.Civ.P. 56.04; *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Carvell v. Bottoms*, 900 S.W. 2d 23, 26 (Tenn. 1995).

No presumption of correctness attaches to the lower court's judgment and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. We must view the evidence in the light most favorable to the nonmoving party, which in this case is the Plaintiff, and must draw all reasonable inferences in favor of the nonmoving party. *Staples v. CBL & Associates, Inc*., 15 S.W.3d 83, 89 (Tenn. 2000).

The Tennessee Governmental Tort Liability Act is embodied at Tenn. Code Ann. § 29-20-101, *et seq.* and provides in pertinent part as follows at Tenn. Code Ann. § 29-20-205 with respect to the immunity of a government entity such as HCBE:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:
> *(1) the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused;* (Emphasis added).

In *Bowers by Bowers v. City of Chattanooga,* 826 S.W.2d 427, 430-431 (Tenn. 1992) the Tennessee Supreme Court adopted a "planning-operational" test as a means of determining when the action of a government employee  constitutes a discretionary function under the above statute:

> Under the planning-operational test, decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational are not considered discretionary acts and, therefore, do not give rise to immunity.
>
> ...
>
> A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational.  If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision.  These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications or schedules.
>
> On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act.  Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies.  These operational acts, which often implement prior planning decisions, are not "discretionary functions'" within the meaning of the Tennessee Governmental Tort Liability Act.  In other words, "the discretionary function exception [will] not apply to a claim that governmental employees failed to

-4-

comply with regulations or policies designed to guide their actions in a particular situation." (Citations omitted).

In support of her argument that Ms. Williams lacked discretion to return Alex to her classroom, Ms. Babb references HCBE's own Code of Acceptable Behavior and Discipline which identifies "striking a teacher" as a "zero tolerance offense" and which requires that a student who commits this offense be expelled for one year. Ms. Babb also cites Tenn. Code Ann.§ 49-6-3401(g) which provides that "a student committing battery upon any teacher ... shall be expelled for a period of not less than one (1) calendar year... ." Ms. Babb argues that given these state and local mandates Ms. Williams was presented with an operational decision, having no choice but to expel Alex from school. Ms. Babb contends that the trial court erred in concluding that Ms. Williams was presented with the discretionary decision of balancing the requirements of the existing zero tolerance policy with the requirements of the IDEA.

In *Wilson County School System v. Clifton*, 41 S.W.3d 645,649 (Tenn. Ct. App. 2000), we reiterated some of the basic goals and requirements of the IDEA:

> In enacting the IDEA, Congress intended, *inter alia*, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C.A. § 1400(d)(1)(A) (West 2000). To this end, the IDEA requires public school districts to develop a curriculum "tailored to the unique needs of the [disabled] child by means of an 'individualized educational program'" (IEP) *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 397-398 (6th Cir. 1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 181-182, 102 S. Ct. 3034, 73 L.Ed.2d 690 (1982)).
>
> ...
>
> The IDEA requires public school districts to ensure that children with disabilities are educated "to the maximum extent appropriate" with nondisabled children. *Doe v. Board of Educ.*, 9 F.3d 455, 460 (6th Cir. 1993), *cert. denied*, 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994); 20 U.S.C.A. § 1412(a)(5)(A) (West 2000). In this way, Congress has stated a "very strong" preference for "mainstreaming" disabled children by placing them in regular classes where feasible. *Doe v. Board of Educ.,* 9 F. 3d at 460. Nevertheless, this "mainstreaming" requirement is not absolute, and courts have recognized that mainstreaming is not required in every case. *Id.* Instead, the proper inquiry remains whether the proposed placement is appropriate under the IDEA. *Id.*

The IDEA decrees, as set forth at 20 U.S.C. § 1415(k)(4)(5), that before a local educational agency can suspend a disabled child from school for more than ten days there must be a

manifestation determination review "by the IEP Team and other qualified personnel" to determine the relationship between the child's disability and the behavior for which such suspension is contemplated.  The behavior of the child will not be deemed to be a manifestation of the child's disability and will subject the child to disciplinary procedures applicable to children without disabilities, only if, *inter alia,* "the child's disability did not impair the ability of the child to understand the impact and consequences of the behavior subject to disciplinary action ... and ... the child's disability did not impair the ability of the child to control the behavior subject to disciplinary action."

Ms. Babb argues that Ms. Williams was not obliged to consider Alex's rights under the IDEA because on December 12, 2002, the IEP Team determined, as evidenced by its report, that Alex "[d]oes not meet the standards for any disabilities."  In further support of this argument Ms. Babb references the IEP team's discussion notes of that date as follows:

> 'No SLD' - He doesn't have a learning disability.
>
> ...
> [T]he student has not been diagnosed with AD/HD at this point.  According to the BASC rating by mom - there appears to be no evidence of AD/HD.
>
> ...
> Team evaluation also rejected AD/HD based on test in 2000.

The December 12, 2002, report of the IEP team does indicate that Alex fails to meet the standards for any disabilities and for that reason is not eligible for special education.  However, while it is clear from the report and attached discussion notes that the team did not find that Alex exhibits a specific learning disability,  the discussion notes also evidence a determination that the evaluation of Alex should continue based upon the team's concern that Alex may otherwise suffer from a health impairment of some nature.  This concern appears to be specifically related to the possibility  that Alex may be manifesting symptoms of AD/HD and that further investigation is warranted in that respect.  Thus, while the team concludes that Alex "has not been diagnosed with AD/HD *at this point"* (emphasis added) and indicates that tests and ratings conducted to date have not presented evidence of AD/HD, it is apparent that, based upon a reasonable analysis of its own observations and other information, the team suspects that Alex's behavior is a manifestation of a health impairment, specifically AD/HD.  Accordingly, the team obviously does not reach a final decision in the matter on December12, 2002.  Our conclusion in this regard is inescapable based upon a complete reading of the team's discussion notes which in their entirety provide as follows:

> Discussion: Alex was a Woodmore student prior to transferral here.  IQ 88 low average.  WJ III was given by Team Eval. and the score were compatable.  *Alex seemed to be restless & mobile during testing*.  Weakness is reading - LW IQ = 88 - Word attack average.  Low Phonics skills.  Reading fluency 81 - *he couldn't stay focused.* - Refer to assessment report.  Broad reading = 55.  Reading avg.

Vocabulary 91. *Alex's attention is definitely a factor.* Broad math = 88 avg. Broad Lang. = 86 = Avg. Broad Listening = 83. *Again it appears to be an attention problem.*

"NO SLD" = He doesn't have a learning disability. *His behaviors appear to be that the student could not remain seated.*

There is some concern as to what his academic records are at this point. There is not form 12 and the student has not been diagnosed with AD/HD at this point.

According to the BASC rating by mom - there appears to be no evidence of AD/HD. The teachers response appears to be significant. *74 - Hyperactivity.* Refer to BASC Report. - *the 74 is high.* Team evaluation also rejected AD/HD based on testing in 2000 (2 yrs. old).

*\* Concerns - Ron - Is this student's medical condition/ AD/HD - Proposed AD/HD is impacting his condition.*

*Team suggest that we close the case for SLD and re-open a case for Health Impaired.*

Be careful to not touch this student. There is some history.

Julie Peters will submit different ideas as to how staff should handle this student.

*This student is protected under IDEA due the fact that this student has a suspected disability.*

\* CSA will hire someone to sit with Alex during school.

Alex hit a teacher on 12/9/02 and he was suspended for zero tolerance but *since this student is suspected of having a disability* Mrs. B. Williams, Principal has decided to reduce suspension until Jan 8th , 2003.

(Emphasis added.)

The last page of the report states:

DESCRIPTION OF ACTION/DECISION AND EXPLANATION: Team suggest that we close the case on SLD. *Team will reopen a new case for Health Impaired.*

OTHER FACTORS RELEVANT TO THE PROPOSED ACTION: Close the case for SLD. *Re-open the case for Health Impaired.*

(Emphasis added.)

That portion of the IDEA set forth at 20 U.S.C. § 1401(3)(A)(i)(ii) defines "a child with a disability" as a child:

> (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (hereinafter referred to as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, *other health impairments*, or specific learning disabilities; and
> (ii) who, by reason thereof, needs special education and related services.

(Emphasis added.)

It is clear that the manifestation determination review under 20 USC § 1415(k)(4)(5) had not concluded when the IEP issued its report on December 12, 2002, but was still pending with a shift of focus from one designation under the Act ("specific learning disabilities") to another ("other health impairments"). Subsection (j) of § 1415 further provides:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child ... until all such proceedings have been completed.

This so-called "stay put" provision of the IDEA did not allow Ms. Williams the option of expelling Alex from school and once this became apparent she was faced with the decision of where to place him within the school. As to the decision she reached, in that regard Ms. Williams attests as follows:

> In particular I decided to reassign [Alex] back to Ms. Babb's classroom. I thought it would be difficult for the child to adjust to a new classroom midway through the school year. Additionally, I believed it would be difficult for a new classroom and a new teacher to adjust to this particular boy. Ultimately, I believed that Ms. Babb's classroom was the best placement [for] this child since he had been there for the first semester. Moreover, with the assistance of a teacher's aide, I believed we were maximizing the chances this boy could control himself and succeed in a regular education enviornment.

It is certainly unfortunate that the Plaintiff was injured by a young student while performing the duties of her profession. However, the school principal was required to balance the interests of the zero tolerance policy versus the need to comply with federal law. This decision was a difficult one, and by necessity required the use of discretion on the part of the school principal. Therefore,

under the circumstances presented in this case, Ms. Williams' decision to re-place Alex in Ms. Babb's classroom was clearly a discretionary decision for which HCBE is not subject to liability.

For the foregoing reasons the judgment of the trial court is affirmed and the cause is remanded for collection of costs below. Costs of appeal are adjudged against Michaela Babb and her surety.

_____
**SHARON G. LEE, JUDGE**